**NOT FOR PUBLICATION**

**UNITED STATES BANKRUPTCY COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| In re: | Case No. 15-29890-A-7 |
| GRAIL SEMICONDUCTOR, A CALIFORNIA CORPORATION, | |
| Debtor. | |
| SEDGWICK FUNDINGCO, LLC, | Adv. No. 18-2180-A |
| Plaintiff, | HSL-2, FSL-7 |
| V. | **MEMORANDUM** |
| MITCHELL NEWDELMAN et al., | |
| Defendants. | |

Argued and submitted on January 19, 2022

at Sacramento, California

Honorable Fredrick E. Clement, Bankruptcy Judge Presiding

Appearances:  Norman Neville Reid, Erik J. Ives, Ryan Schultz, Fox Swibel Levin & Carroll LLP and Jeffrey I. Golden, Beth E. Gaschen, Weiland Golden Goodrich LLP for Sedgwick FundingCo, LLC; Ivan K. Mathew, Ivan K. Mathew P.C. for Mitchell NewDelman, Frank Holze, and Willis Higgins

These are cross-motions for summary judgment. Each party is a creditor of debtor Grail Semiconductor: (1) plaintiff/counter-defendant Sedgwick FundingCo, LLC ("Sedgwick"), an affiliate of Gerchen Keller Capital, LLC ("GKC"); and (2) defendants/counter-claimants Willis "Woody" Higgins, Mitchell NewDelman, and Frank Holze (collectively the "NewDelman Group"). At stake is $2.1 million on deposit with the Clerk of the Court, which are remnant funds from a now completed Chapter 7 bankruptcy by Grail Semiconductor. Insofar as Sedgwick is concerned, also at stake is potential additional liability to the NewDelman Group of upwards of $2.85 million for breach of contract and/or common law torts.

The source of the controversy is an intercreditor agreement between the parties. Intercreditor agreements are contracts between creditors of a common debtor that re-order or, in some cases, confirm each creditor's rights vis-à-vis other creditors. Sedgwick contends it holds a superior right to the disputed funds by virtue of the intercreditor agreement. In contrast, the NewDelman Group contends that Sedgwick owes it money for breach of the intercreditor agreement and/or for common law torts (including conspiracy to commit fraud by concealment) arising out of that agreement.

The disputed funds are the proceeds of prepetition state court litigation by the debtor. The Chapter 7 debtor, Grail Semiconductor, sued a competitor, Mitsubishi Electric & Electronics USA Inc. ("Mitsubishi Electric"), for breach of a non-disclosure agreement; that litigation consumed it for eight years. Grail Semiconductor was represented by the law firm of Niro, Haller and Niro ("the Niro firm"). After seven years of litigation, Grail Semiconductor needed additional funds to continue the fight; so, it took a secured loan

from GKC and/or Sedgwick using future proceeds of the Mitsubishi
Electric action as collateral.  As a part of GKC's agreement to fund
that loan, it demanded that existing secured creditors subordinate
their rights to payment from litigation proceeds.  GKC and the
NewDelman Group attempted to enter into a pre-settlement intercreditor
agreement, known as the "Priority Agreement," for the division of the
Mitsubishi Electric litigation proceeds.

The court uses the word "attempted" purposefully because GKC, who
last signed the agreement, added "Sedgwick FundingCo, LLC" as a party
to, or third party beneficiary of, the agreement after all other
parties had signed it.  The record does not indicate that the
NewDelman Group ever accepted the changed terms of the agreement.

The Priority Agreement designated the Niro firm to receive
litigation proceeds into its client trust account and instructed that
firm to pay those monies out to Sedgwick and to the NewDelman Group.
And the Niro firm agreed to do so.

Indeed, the Mitsubishi Electric litigation did settle.  But the
amount of the settlement was not sufficient to pay all signatories to
the Priority Agreement the amounts due them.  And, unfortunately, the
Priority Agreement was facially ambiguous as to how the Niro firm
should distribute proceeds in the event of insufficiency.  By
describing Sedgwick as a "Second Priority" creditor and the NewDelman
Group as a "Third Priority" creditor the agreement could reasonably be
construed to require payment in full to Sedgwick before making any
payment to the NewDelman Group.  But the agreement also required the
Niro firm to pay Sedgwick and the NewDelman Group "concomitantly" (at
the same time) and in "pari passu" (at an equal rate) suggesting
simultaneous, pro-rata payment of all parties from available funds.

 1          Aware that the settlement would not pay the Niro firm's fees and

 2    all signatories of the intercreditor agreement the full amounts due

 3    them, Grail Semiconductor, Sedgwick, the Niro firm, and their

 4    principals cut a side deal for immediate and full payment of Sedgwick.

 5    The side agreement was reduced to writing, known as a "Letter of

 6    Intent."  The Letter of Intent, and the Niro firm's actions to

 7    implement it, satisfy all elements of a civil conspiracy for which

 8    Sedgwick is liable.  The Niro firm's actions to carry out the Letter

 9    of Intent satisfy most of the elements of fraud by concealment.

10    Having already agreed in the Priority Agreement to receive and

11    disburse litigation proceeds to the signatories to the agreement, the

12    Niro firm acted as the signatories' (including the NewDelman Group)

13    agent with respect to those proceeds and owed them fiduciary duties,

14    including the duty of full disclosure.  Notwithstanding that

15    obligation, the Niro firm did not inform the NewDelman Group of the

16    terms of the Letter of Intent or of the Niro firm's intention to pay

17    Sedgwick, while paying NewDelman nothing.  Instead, the Niro firm paid

18    Sedgwick.  By doing so, the Niro firm concealed a material fact from

19    one of its principals, i.e., the NewDelman Group, causing injury; the

20    only elements of fraud by concealment not resolved by this motion are:

21    (1) the NewDelman Group's inability to discover the concealed fact by

22    reasonable inquiry; and (2) reliance resulting in damages.

23          The bottom line is this.  A genuine dispute of material facts

24    exists as to: (1) whether the NewDelman Group accepted the Priority

25    Agreement, as revised to add "Sedgwick FundingCo, LLC"; and (2) if so,

26    that agreement's meaning.  Not in dispute are the facts showing: (1)

27    the Niro firm acted as an agent for both GKC/Sedgwick and the

28    NewDelman Group in the receipt and disbursement of Mitsubishi Electric

litigation proceeds and, therefore, owed each creditor fiduciary

duties (including a duty of full disclosure); (2) Grail Semiconductor,

GKC/Sedgwick, and the Niro firm entered into a civil conspiracy to

defraud the NewDelman Group; (3) the Niro firm's disbursement of funds

to Sedgwick, without payment to the NewDelman Group or notice,

satisfies all the elements of fraud by concealment (except for the

NewDelman Group's inability to discover the truth with reasonable

inquiry and the existence, as well as amount, of damages); (4) the

Niro firm's actions in disbursing funds were within the scope of the

conspiracy with Grail Semiconductor and GKC/Sedgwick; and (5) Sedgwick

is liable for the Niro's firm's fraud, if any.

## I.  FACTS

### A.  Grail Semiconductor

In 2000, cousins Robert Stern and Donald Stern formed Grail

Semiconductor as a California corporation;[1] its raison d'etre was to

"hold and exploit" a "nonvolatile semiconductor memory device"

developed by Donald Stern.  Stipulation of Agreed Facts and

Authenticity of Documents 6:7-16, ECF No. 240;[2] Compl. 3:14-16, ECF No.

1.  Nonvolatile memory devices retain data even after the power to

that device is shut off.  Donald Stern and Robert Stern are, and were,

Grail Semiconductor's only shareholders.  As pertinent here, its Board

of Directors was comprised of Donald Stern, Robert Stern and Richard

---

[1] Originally, it was known as NV Memory, Inc.

[2] Except for Exhibits 51 and 74, Common Ex. 813-847, 933-936, the parties have stipulated to the authenticity of all exhibits.  Agreed Facts 2:12-21, ECF No. 240.  The objection to Exhibit 51 is overruled. The Forward Purchase Agreement and Security Agreement have been authenticated by Adam Gerchen, Common Ex., Gerchen Aff. 1800:9-1801:11, ECF No. 252, and are properly before this court.  The court abstains from the objection to Exhibit 74, which the court has not relied on.  Moreover, neither side has filed objections to any other evidence proffered and the deadline to do so has now passed.  Order Regarding Re-filing Cross-Motions for Summary Judgment 8:22-24, ECF No. 228. All other evidentiary objections, including hearsay objections, are waived.

L. Gilbert.  Agreed Facts 6:13-7:14, ECF No. 240.  At all pertinent times, Ronald Hofer ("Hofer") was Grail Semiconductor's Chief Executive Officer and Brad Woods ("Woods") was its Chief Financial Officer.  Agreed Facts 7:15-18, ECF No. 240.

In 2001, Grail Semiconductor explored a joint venture with Mitsubishi Electric to capitalize on the nonvolatile semiconductor memory technology.  As a part of those discussions Grail Semiconductor demanded, and Mitsubishi Electric signed, a non-disclosure agreement.  Compl. 3:17-22, ECF No. 1.  Mitsubishi Electric violated the agreement and "improperly used [Grail Semiconductor's] trade secrets" to develop its own memory chips.  Compl. 3:20-22, ECF No. 1.

In 2011, Grail Semiconductor ceased business operations and, thereafter, devoted itself to litigation against Mitsubishi Electric for breach of the non-disclosure agreement and, later, against Renesas Electronics America, Inc. ("Renesas") for patent infringement.  Agreed Facts 7:19-21, ECF No. 240.  After 2011, Grail Semiconductor's primary source of monies was litigation funding loans.  Agreed Facts 7:22-8:4, ECF No. 240.

**B.   Grail Semiconductor Sues Mitsubishi Electric and Renesas Electronics**

In 2007, Grail Semiconductor brought a state court action against Mitsubishi Electric for breach of the non-disclosure agreement.  Agreed Facts 8:6-11, ECF No. 240.  At the outset, Grail Semiconductor was represented by the law firm of Schwartz, Rimberg & Morris LLP ("Schwartz firm") on an hourly basis.  Agreed Facts 8:11-12, ECF No. 240.

In July 2011, Grail Semiconductor decided a multifaceted strategy change to the Mitsubishi Electric litigation was required.  So, it

replaced the Schwartz firm with the Chicago law firm of Niro, Haller &
Niro Ltd. Agreed Facts 8:13-15, ECF No. 240.  The Niro Firm's lead
counsel in the case was Raymond P. Niro, Sr., the firm's founder and
managing shareholder.  Grail Semiconductor and the Niro firm signed a
contingent fee agreement.  Common Set of Ex. for Purposes of Cross-
Motions Summary Judgment, Ashley Keller Aff. 1806:3-6, ECF No. 252.
The fee agreement provided that the Niro firm would be compensated for
its representation by receipt of a percentage of any recovery, but the
agreement contained a "pay as you go" provision for out-of-pocket
litigation costs.

Also in July 2011, Grail Semiconductor retained Willis Higgins as
its patent attorney.  Higgins agreed to provide "assistance locating a
source of funding, an introduction to potential patent litigation
counsel, in-house patent counsel services including monitoring the
litigation, invention evaluation and patent strategies, patent
application drafting and representation in the U.S. Patent and
Trademark Office."  Common Ex., Letter from Higgins to Hofer dated
July 5, 2011, 688-689, ECF No. 246.  In exchange, Higgins was to be
paid three percent of "the gross proceeds of the patent litigation,
whether as a result of a settlement or court judgment." *Id.*  Grail
Semiconductor's board of directors approved retention of Higgins and
his fees.  *Id.* at 690; Agreed Facts 9:22-27, ECF No. 240.

In August 2011, Grail Semiconductor opened a second litigation
front; this time it did so against Renesas Electronics America, Inc.,
for patent infringement.  Agreed Facts 9:3-10, ECF No. 240.  Grail
Semiconductor was represented in that litigation by the firm of
Mishcon de Reya New York LLP.  Agreed Facts 9:3-10, ECF No. 240.  When
Grail Semiconductor failed to pay its fees, Mishcon withdrew from

representation and was awarded $2.1 million in fees against Grail

Semiconductor; the patent litigation itself was dismissed for failure

of prosecution.  Agreed Facts 9:22-27, ECF No. 240.

Strapped for cash and needing to pay Mitsubishi Electric

litigation costs, in September 2011, Grail Semiconductor obtained a

litigation funding loan from 1st Class Legal (IS) Limited ("1st Class

Legal").  Agreed Facts 7:19-21, 8:16-20, ECF No. 240.

In October 2011, Grail Semiconductor's board of directors

approved a finder's fee for Mitchell NewDelman and for Frank Holze for

their "instrumental" services in arranging litigation financing from

1st Class Legal.  Common Ex., Minutes of Special Board of Directors

Meeting on October 4, 2011, 694-695, ECF No. 246; Agreed Facts 9:14-

17, ECF No. 240.  The board of directors adopted the following

resolution.

> Resolved: That Frank Holtz (sic) and Mitchell NewDelman be
> granted fees for the following amount and terms; Mitchell
> NewDelman's percentage is 5% and Frank Holtz's (sic)
> percentage is 1%.  These percentages shall be of the gross
> proceeds of the patent infringement litigation and the NDA,
> whether as a result of a settlement or court judgment.
> Should a settlement, including patent infringement damages
> and a patent license be reached in the nondisclosure case
> currently pending against Mitsubishi in Santa Clara,
> California, the percentage of gross proceeds attributable
> to patent infringement damages and a patent license shall
> be paid in accordance with this Resolution.  Should Grail
> obtain a settlement including patent infringement damages
> or grant a patent license without obtaining an
> apportionment of any payment for patent damages and a
> patent license, the percentage of gross proceeds shall be
> applied to the entire settlement amount.

*Id.*

Later, in February 2012, 1st Class Legal advanced Grail

Semiconductor an additional $700,000.  Agreed Facts 8:18-20, ECF No.

240.[3]  NewDelman and Holze each received an additional finder's fee for

---

[3] Though the Agreed Facts 8:18-20, ECF No. 240, indicate that 1st Class Legal

the February 2012, advance in the amount of $35,000 in cash. Agreed Facts 9:18-21, ECF No. 240.

On April 12, 2012, Grail Semiconductor and the Niro firm entered into an Amended Fee Agreement. Agreed Facts 10:2-5, ECF No. 240; Common Ex., Amended Fee Agreement 711-722, ECF No. 246. That amendment provided for the distribution of the proceeds of the Mitsubishi Electric action between Grail Semiconductor, the Niro firm, 1st Class Legal, members of the NewDelman group, Stern, and Hofer; it specified the order and amount of those distributions. Agreed Facts 10:6-22, ECF No. 240. As pertinent here, Section 5 of the Amended Fee Agreement provided:

> As set forth in paragraph 3, Grail will agree to receive into our [the Niro firm's] client trust account on behalf of Grail any Recovery (as defined in paragraph 4)...[from the Mitsubishi Electric litigation], and further Instructs our firm to first pay to 1st Class Legal, and to the order of each of the above named individuals...from Grail's share of any Recovery, any sum due Grail to 1st Class Legal...and any sum due by Grail to the above named individuals prior to distribution of the same to Grail or any other designee of Grail....*This payment obligation of Grail is not intended to and does not amend, lessen or supersede the determination of the amount and timing of our firm's compensation or reimbursement of expenses from each Recovery and that any payment made to 1st Class Legal or to the order of each of the above named individuals pursuant to paragraph 5 shall not reduce or delay payments for our firm's services or reimbursement of expenses.* The amounts of the payments to 1st Class Legal and respectively to the order of the above named Individuals shall be determined as follows:
>
> 1st Class Legal: Eight and one half percent (8.5%) of the gross recoveries for its investment of $3 million dollars and an additional five (5%) of the gross Recoveries for its investment of $700,000.
>
> Mitchell J. NewDelman: Five percent (5%) of the gross Recoveries.

---

made two advances, the source data suggests 1st Class Legal made three separate advances. Common Ex., Minutes of Special Meeting of Board of Directors on October 19, 2015, ¶ 3, ECF No. 245.

       Dr. Frank B. Holze: One percent (1%) of the gross Recoveries.

       Willis E. Higgins: Three percent (3%) of the gross Recoveries.

       Donald S. Stern: Five percent (5%) of the gross Recoveries.

       Ronald W. Hofer: Five percent (5%) of the gross Recoveries.

Agreed Facts 10:6-22, ECF No. 240; Common Ex., Amended Fee Agreement 716-717, ECF No. 246 (emphasis added).

In May 2012, Grail Semiconductor prevailed against Mitsubishi Electric at trial and was awarded $124 million in damages. Agreed Facts 8:21-23, ECF No. 240. Thereafter, Mitsubishi Electric won, in part, its motions for a new trial and judgment notwithstanding the verdict; as a result, the trial court ordered a new trial solely on the issue of damages. Agreed Facts 8:23-25, ECF No. 240. Appeals followed and, ultimately, the matter was remanded to the trial court with an order to retry the damages phase of the action only. Agreed Facts 8:25-9:2, ECF No. 240.

In early 2013, Grail Semiconductor filed a Certificate of Domestication and Articles of Incorporation with the State of Florida, and thereby incorporated itself under the laws of the State of Florida. Agreed Facts 6:10-12, ECF No. 240.

In the Fall 2014, after the case had been remanded, Grail Semiconductor needed additional funding for litigation and other corporate expenses. Agreed Facts 11:11-14, ECF No. 240. But Grail Semiconductor was dissatisfied with its dealings with 1st Class Legal and sought financing elsewhere. Common Ex., Minutes of Special Meeting of Board of Directors on October 19, 2015 ¶ 3, 658, ECF No. 245; Common Ex., Email from Ronald Hofer dated October 22, 2014, 749, ECF No. 246. Grail Semiconductor's counsel, Ray Niro (who had a pre-

existing relationship with GKC) introduced Ronald Hofer, Grail
Semiconductor's Chief Executive Officer, to one of GKC's principals
"for the purposes of discussing potential terms for litigation
financing to be provided to Grail Semiconductor."  Agreed Facts 11:14-
19, ECF No. 240.

**C.    Enter GKC/Sedgwick**

GKC is "an investment and advisory firm focused on litigation
financing."  Agreed Facts 10:24-26, ECF No. 240; Common Ex., Adam
Gerchen Aff. 1799:9-15, ECF No. 252.  It manages in excess of $1.4
billion in assets for "public pensions, financial institutions, non-
profit foundations, university endowments and family offices."  Common
Ex., Adam Gerchen Aff. 1799:9-15, ECF No. 252.  Adam Gerchen co-
founded GKC and was its Chief Executive Officer, *Id.* at 1799:1-3;
Ashley Keller co-founded GKC and was a Managing Director, Common Ex.,
Ashely Keller Aff. 1804:4-7, ECF No. 252; and Betsy Thelen functioned
as GKC's General Counsel, Common Ex., Betsey Thelen Aff. 1816:1-3, ECF
No. 252.  Typically, GKC used "a separate single-purpose entity for
each litigation financing transaction."  Common Ex., Adam Gerchen Aff.
1799:12-14, ECF No. 252.

In this case, GKC managed GKC Partners II, LLP, an investment
fund. GKC Partners II, LLP provided funds for the Grail Semiconductor
litigation against Mitsubishi Electric through its wholly-owned
subsidiary Sedgwick.  Agreed Facts 10:24-11:7, ECF No. 240; Common
Ex., Adam Gerchen Aff. 1799:17-19, ECF No. 252.  Sedgwick was a
single-purpose entity formed to fund the Grail Semiconductor action
against Mitsubishi Electric.  *Id.*

After discussions, Sedgwick agreed to fund the action against
Mitsubishi Electric in exchange for a return in excess of three times

the monies loaned.  Common Ex., Gerchen decl. 1800:9-1801:11, ECF No.
252.  On October 29, 2014, Grail Semiconductor and Sedgwick executed a
Prepaid Forward Purchase Agreement and a Security Agreement.  *Id.* at
814-830, 840-847, ECF No. 247; Agreed Facts 11:23-12:2, ECF No. 240.
Summarized, these agreements provided the following: (1) Sedgwick
agreed to loan Grail Semiconductor up to $5 million to fund the action
against Mitsubishi Electric (including a $3 million advance
immediately upon execution); (2) Grail Semiconductor agreed to provide
Sedgwick with a security interest in the Mitsubishi Electric
litigation proceeds; and (3) Grail Semiconductor promised to repay
Sedgwick three times the amount advanced plus a commitment fee.
Common Ex., Prepaid Purchase Agreement §§ 1, 2.1-2.5, Security
Agreement § 1, 814-818, 840, ECF No. 247.  Of particular import are
the provisions of the Forward Purchase Agreement and Security
Agreement that describe the identity of existing encumbrances against
litigation proceeds and the intended priority of secured creditors to
litigation proceeds.  The Purchase Agreement provided:

> Priority of Payment.  Seller agrees to satisfy its
> obligations hereunder as follows:
>
> (i) Before paying any other Entity or paying any Litigation
> expenses or other expenses of Seller, Seller shall use
> [Mitsubishi Electric litigation] Proceeds first to pay
> Purchaser [Sedgwick] the First Dollars Out Return.
>
> (ii) After paying Litigation Counsel [Niro, Haller & Niro,
> Ltd.] the costs and fees owed pursuant to the Litigation
> Counsel Engagement Agreement, but before paying any other
> Entity (other than Litigation Counsel) or paying any other
> expenses of Seller, Seller shall pay Purchaser [Sedgwick]
> the Deployment Return and the Commitment Fee.

Common Ex., Prepaid Forward Purchase Agreement § 2.6, 818, ECF No.
247.

It also provided:

1      <u>Seller's Representations.</u>  Seller represents and warrants
       to Purchaser as of the Agreement Date that:
2
       ...
3
       (b) Except as set forth on <u>Schedule 3.2(b)</u>, Seller is the
4      sole legal and beneficial owner of and has good title to
       the [Mitsubishi Electric] Litigation, the Proceeds, and the
5      Transferred Rights, free and clear of any Encumbrance
       (other than Litigation Counsel under the Litigation Counsel
6      Engagement Agreement or to First Class [Legal] under the
       First Class Funding Agreements).
7
       ...
8

9   Common Ex., Prepaid Forward Purchase Agreement § 3.2, 819, February 5,

10  2021, ECF No. 247 (emphasis original).

11      Schedule 3.2(b) contained nine exceptions to the free and clear

12  of encumbrance representation.

13
       | | |
       |---|---:|
       | Mischcon de Reya | $1,650,000 |
       | Schwartz Ferentz... | $2,371,404 |
       | Saez and Benyamin | $348,000 |
       | * First Class [Legal] | $19% Plus $17,400,000 Loan Repayment |
       | Mitchell J. NewDelman | 5%** |
       | Dr. Frank B. Holze | 1%** |
       | Willis E. Higgins | 3%** |
       | Donald S. Stern | 5%** |
       | Ronald W. Hofer | 5%** |

19

20     * First Class[.] This amount may change down one or two
       percent.  Pursuant to the First Class Funding Agreements,
21     First Class has agreed to third priority payment of gross
       recoveries from the [Mitsubishi Electric] Litigation, after
22     payment to Litigation Counsel and Purchaser.

23     ** Pursuant to the First Class Funding Agreements, these
       individuals have agreed to third priority of gross
24     recoveries from the Litigation, after Litigation Counsel
       and Purchaser.  Payment of these percentages is pari passu
25     with First Class's 19% interest in the gross recoveries
       from the [Mitsubishi Electric] Litigation.

26  Common Ex., Prepaid Forward Purchase Agreement, Schedule 3.2(b), 829,

27  ECF No. 247.

28

The Security Agreement contemplated that GKC/Sedgwick would be paid first, and in full, from the Mitsubishi Electric litigation proceeds:

> THE PLEDGOR'S COVENANTS.  The Pledgor [Grail Semiconductor] represents, covenants, and warrants that unless compliance is waived by the Secured Party in writing:
>
> ...
>
> (d) The *Pledgor has not granted* and will not grant *any security interest in any of the Collateral* [Mitsubishi Electric litigation proceeds] except to the Secured Party (and, if applicable, to Litigation Counsel pursuant to the Counsel Engagement Agreement) and will keep the Collateral free and clear of all liens, claims, security interests, and encumbrances of any kind or nature except the security interest of the Secured Party (and, if applicable, to Litigation Counsel pursuant to the Counsel Engagement Agreement).
>
> ...
>
> (g) Except as otherwise set forth in Section 2.6 of the Forward Purchase Agreement, *the Pledgor shall cause all Proceeds to be paid to the Secured Party on account of the Secured Obligations* [all debts Grail Semiconductor owes to GKC/Sedgwick] until the Secured Obligations *are paid in full.*

Common Ex., Security Agreement § 2(d), (g) 840-841, ECF No. 247 (emphasis added).

To effectuate the funding agreement, on October 31, 2014, Grail Semiconductor, the Niro firm, and Sedgwick signed a letter agreement. In the pertinent part the letter agreement provided:

> [The Niro firm] represents [Grail Semiconductor] in connection with certain litigation against Mitsubishi Electric & Electronics USA, Inc...pursuant to [a fee agreement, dated April 10, 2012].  [Grail Semiconductor] has agreed to a forward purchase agreement by Sedgwick FundingCo, LLC, a New York limited liability company...., of a portion of the proceeds payable to [Grail Semiconductor] from the [Mitsubishi Electric litigation], pursuant to a Prepaid Forward Purchase Agreement dated October 29, 2014....
>
> *[Grail Semiconductor] hereby irrevocably instructs [the Niro firm], and [the Niro firm] hereby irrevocably*

*acknowledges and agrees, pursuant to the existing [fee agreement], that:*

> (a) it will instruct the applicable defendant(s) or other applicable parties *to pay any Proceeds* (used herein as defined in the Forward Purchase Agreement) owed to [Grail Semiconductor] *into a trust account maintained by [the Niro firm]*;

> (b) *it will not make any payment from Proceeds received by it from time to time to any person or entity (other than [Sedgwick FundingCo, LLC]) (including, without limitation, [Niro] or [Grail Semiconductor], until [Sedgwick FundingCo, LLC] has received payment in full for the amount of [l]itigation expenses funded by [Sedgwick FundingCo, LLC] pursuant to the Forward Purchase Agreement* (the "Funded Expenses"), which has a maximum of $2,000,000, after which time [the Niro firm] may pay itself any amounts [the Niro firm] is owed for costs and fees pursuant to the [fee agreement, dated April 10, 2012]; and

> (c) in the event [Grail Semiconductor] does not instruct [the Niro firm] to pay [Sedgwick FundingCo, LLC] an amount equal to the amount owed by [Grail Semiconductor] to [Sedgwick FundingCo, LLC] under the Forward Purchase Agreement with respect to such Proceeds (the "FundCo Return") within three (3) business days of the date [the Niro firm] notifies [Grail Semiconductor] of its receipt of Proceeds, then, upon receipt of written direction from [Sedgwick FundingCo, LLC] that contains the calculation of the FundCo Return, including the calculation of Funded Expenses, [the Niro firm] will promptly pay [Sedgwick FundingCo, LLC] the amount of the Funded Expenses, then, after paying itself any amounts [the Niro firm] is owed for costs and fees pursuant to the [fee agreement, dated April 10, 2012, the Niro firm] will promptly pay the FundCo Return to [Sedgwick FundingCo, LLC] from (and to the extent of) the Proceeds.

[The Niro firm, Grail Semiconductor] and Sedgwick FundingCo, LLC] acknowledge and agree that the term of this letter of instruction may not be changed without consent of [Sedgwick FundingCo, LLC].

Please indicate your agreement with the foregoing by signing in the space provided below.

Common Ex., Grail Semiconductor letter, dated October 31, 2014, 831-832, ECF No. 247 (emphasis added).

The letter agreement was signed by Ronald Hofer, on behalf of

15

Grail Semiconductor; Ray Niro, on behalf of the Niro firm; and Adam
Gerchen, on behalf of Sedgwick.  *Id.* at 832.

Shortly thereafter, Sedgwick filed a UCC-1 financing statement in
the State of Florida pursuant to the Security Agreement signed by
Grail Semiconductor and Sedgwick.  Agreed Facts 12:3-5, ECF No. 240.

**D.    The Priority Agreement**

Since the Forward Purchase Agreement, and the documents
effectuating that, only bound GKC/Sedgwick, Grail Semiconductor, and
the Niro firm, GKC/Sedgwick wanted to secure its superior right to
Mitsubishi Electric litigation proceeds vis-à-vis Grail
Semiconductor's other creditors, i.e., the NewDelman Group.

On October 20, 2014, prior to advancing funds to Grail
Semiconductor, Betsy Thelen, GKC's general counsel, drafted an email
to Ron Hofer, Grail Semiconductor's CEO.  It stated:

> Ron-I took a look at the Retainer Agreement [with the Niro
> firm] and saw the information regarding the other
> stakeholders in the litigation proceeds.  Each stakeholder
> has a percentage interest in gross recoveries, as opposed
> to recoveries net of payment to Niro, GKC and 1st Class.
> As a result, we will need the 5 individuals to sign onto
> the Priority Agreement as well.
>
> Mitchell J. NewDelman: Five percent (5%) of the gross
> Recoveries.
>
> Dr. Frank B. Holze: One percent (1%) of the gross
> Recoveries.
>
> Willis E. Higgins: Three percent (3%) of the gross
> Recoveries.
>
> Donald S. Stern: Five percent []5%[] of the gross
> Recoveries.
>
> Ronald W. Hofer: Five percent []5%[] of the gross
> Recoveries.

Common Ex., Email from Thelen to Hofer dated October 21, 2014, 747,
ECF No. 246.

On October 21, 2014, Ronald Hofer responded by return email: "Grail has not (sic) agreement with these individuals. I asked Ray [Niro] to include this in the retainer agreement. Could I not just send him a request to make it net? I will call you later this morning." Common Ex., Email from Hofer to Thelen, ECF No. 246.

### 1.    Priority Agreement (the 1st Class Legal Draft)

On October 22, 2014, Ronald Hofer sent (at least some of) the members of the NewDelman Group an email. The subject line stated, "Waiver of Gross Revenues." It stated:

> The purpose of this email is to bring you up to date regarding the current status of Grail. Grail has a significant issue with its funder, 1st Class [L]egal. Grail has not had any money for the last 11 months. Facing serious problems with the ability of continuing the NDA case against Mitsubishi, Grail went into the market 3 weeks ago on its own and located a new funder for the infusion of $5MM to continue the law suit (sic).
>
> Grail and GKC, LLC, located in Chicago[,] have signed closing documents for this funding. *The funder had only one significant requirement and that is a waiver of priority from 1st Class Legal and for those of us that have points, waiver of 'gross recoveries.' Attached please find an agreement that satisfies the funder.* We need this today so as to begin drawing down funds. We have a trial beginning next week and the law firm will withdraw if they are not paid before trial. We have not paid them for 11 months and the outstanding invoice is $425,000.
>
> In the event you have question[s] please call. Thank you for your effort and continued support.
>
> Ron [Hofer]

Common Ex., Email from Hofer dated October 22, 2014, 749, ECF No. 246 (emphasis added).

NewDelman and Higgins admit receiving Hofer's email. Common Ex., NewDelman Dep. 1139:1-1141:14, ECF No. 251; Higgins Dep. 1446:17-1450:21, ECF No. 251.[4]

---

[4] It is unclear whether the email was addressed to Frank B. Holze or whether

A draft priority agreement was attached to the email.  Common Ex., Email from Hofer 749, ECF No. 246.  That agreement had been drafted by 1st Class Legal.  Common Ex., NewDelman Dep. 1140:2-7, ECF NO. 251; Common Ex., Higgins Dep. 1448:14-20, ECF No. 251.

As pertinent here, the 1st Class Legal draft priority agreement provided:

...

2.1   The intention of this Agreement as acknowledged and agreed to by the parties [Mitchell NewDelman, Don Stern, Woody Higgins, Frank Holze and Ronald W. Hofer] is to detail the circumstances, consideration and related matters in relation to a change in the priority status with regard to access to all or any funds awarded, costs obtained and interest add (sic) to or derived from the litigation (the award) identified as Case No. 1-07-CV-098590, in the Superior Court in Santa Clara, California and all subsequent related cases or hearings. (the case) (sic).

2.2   Prior to the completion of this agreement the law firm involved with the case, Niro, Haller & Niro Ltd. (Niro) of 181 West Madison Street, Suite 4600, Chicago, Illinois 60602-4515 had first priority or call on the award derived by Grail in the case and the Parties had a claim on proceeds of gross recoveries as third priority.

2.3   *It is hereby agreed by all the parties [Mitchell NewDelman, Don Stern, Woody Higgins, Frank Holze, and Ronald W. Hofer] that as and from the date of this Agreement the priority status in relation to the award shall be changed to:*

First Priority-Niro;

Second Priority-GKC and

Third Priority-[1st Class Legal]

*Parties [Mitchell NewDelman, Don Stern, Woody Higgins, Frank Holze and Ronald W. Hofer]*

2.4   It is also agreed by all the parties that all or any other persons or entities having any claim or potential claim on the award shall be subservient to Parties in terms of any priority status in relation to the award.

...

he received it.

Common Ex., Draft Priority Agreement 750, ECF No. 246 (emphasis added).

The NewDelman Group considered, and rejected, the draft priority agreement as "one-sided" in favor of 1st Class Legal and GKC.  Common Ex., NewDelman Dep. 1142:2-13, ECF No. 251.

### 2.    Priority Agreement (the Higgins Draft)

Higgins undertook to re-draft the Priority Agreement.  On October 26, 2014, Higgins sent an email to NewDelman, Holze and Hofer.  It was entitled "Priority Agreement" and stated:

> All,
>
> Here is what I believe to be the final version of the above agreement, ready for execution.  My understanding from my conversations yesterday and today is that all of you accept the substance of this document.  I have edited it based on the received comments to be consistent with the style and terminology of the April 10, 2012[,] Amended Fee Agreement. Let's wrap this up.
>
> Regards,
>
> Woody Higgins

Common Ex., Email from Higgins 753, ECF No. 246.

That agreement provided:

> Reference is made to a[n] Amended Fee Agreement dated April 10, 2012[,] by and between Niro, Haller and Niro and Grail Semiconductor, Inc., which is hereby incorporated by reference herein.  *Except as expressly modified in this Agreement, the Amended Fee Agreement remains in full force and effect.*
>
> The last sentence of Paragraph 5 of the Amended Fee Agreement at page seven (7) is hereby deleted and replaced with the following provision.
>
> The amounts of the payments to Niro, Haller and Niro, Gerchen Keller Capital LLC (GKC herein), [and] First Class Legal (First Class herein) shall be determined in accordance with their respective agreements as of the date of this Priority Agreement with Grail Semiconductor, Inc., and the individuals set forth below specifically referred to in the Amended Fee Agreement as 'the above named individuals' shall be determined as follows:

First Priority: Niro, Haller and Niro in accordance with the Amended Fee Agreement.

Second Priority: GKC

Third Priority: First Class for reimbursement of loans and related interest up to seventeen million four hundred thousand U.S. dollars (US $$17.4 million) as of the date of this Priority Agreement, and distributions of gross Recoveries as defined in the Amended Fee Agreement thereafter by percentages *pari passu* with 'the above named individuals' as follows:

    First Class: Nineteen Percent (19.0%) of the gross Recoveries.

    Mitchell J. NewDelman: Five percent (5%) of the gross Recoveries.

    Dr. Frank B. Holze: One percent (1%) of the gross Recoveries.

    Willis E. Higgins: Three percent (3%) of the gross Recoveries.

    Donald S. Stern: Five percent (5%) of the gross Recoveries.

    Ronald W. Hofer: Five percent (5%) of the gross Recoveries.

*All of the first, second and third priority payments shall be made concomitantly* and directly by Niro, Haller and Niro from their trust account to the first, second and third priority entities and individuals (or to the respective order of such individuals, or their respective estate or administrator, if deceased or known to be incapacitated). The remaining balance of the gross Recoveries shall be then paid to Grail Semiconductor, Inc. by Niro, Haller and Niro from their trust account.

This agreement is the entire agreement between the parties hereto and is effective as of the date of the last signature below.  Separate signed copies shall be treated as a single original, and a signed, digitally scanned and transmitted by e-mail attachment shall constitute execution and delivery by the respective party thereto.

Common Ex., Priority Agreement 754-764, ECF No. 246 (emphasis original and added).

Except for Sedgwick/GKC, all of the parties (including Grail Semiconductor and the Niro firm) to the Priority Agreement signed it

without change in late October and early November 2014.  Agreed Facts

13:10-13, ECF No. 240.

Even though the Priority Agreement had not yet been signed by all

parties, between November 5, and November 20, 2015, GKC/Sedgwick made

three capital advances aggregating $3.44 million of $5 million

available under the litigation funding agreement.  Agreed Facts 12:6-

15, ECF No. 240; *compare* Common Ex., Purchase Agreement and Security

Agreement, 814, 840, ECF No. 247 (effective date October 29, 2014),

with Agreed Facts 12:6-9, ECF No. 240 ($3 million advanced on November

5, 2014).

On November 26, 2014, GKC signed the Higgins draft of the

Priority Agreement, backdating it to October 31, 2014.  Agreed Facts

13:14-19, ECF No. 240.  But before signing it GKC changed the terms of

Priority Agreement to add a parenthetical behind the words: "Second

Priority: GKC"; after that modification the agreement read, "Second

Priority: GKC (including its affiliate, Sedgwick FundingCo, LLC)":

> The amounts of payments to Niro, Haller and Niro, Gerchen
> Keller Capital LLC (GKC herein), [and] First Class Legal
> (First Class herein) shall be determined in accordance with
> their respective agreements as of the date of this Priority
> Agreement with Grail Semiconductor, Inc., and the
> individuals set forth below specifically referred to in the
> Amended Fee Agreement as 'the above named individuals'
> shall be determined as follows:
>
> ...
>
> Second Priority: GKC *(including its affiliate, Sedgwick
> FundingCo, LLC)*
>
> /s/ Gerchen Keller Capital LLC

Agreed Facts 13:14-19, ECF No. 240; Common Ex., Priority Agreement ¶

2, 870, ECF No. 248 (emphasis added).

GKC returned the agreement to Grail Semiconductor by email from

its counsel Betsy Thelen; she called the modification to Grail

Semiconductor's attention and requested that all parties initial the change adding Sedgwick.  Agreed Facts 13:14-19, ECF No. 240; Common Ex., November 26, 2014, Email from Betsy C. Thelen to Ronald Hofer 868, ECF No. 248.

> Ron-
>
> Attached is a signed Priority Agreement.  My apologies that this item took so long.
>
> We wrote onto the first page "(including its affiliate, [Sedgwick FundingCo, LLC]" next to the name of GKC, *just to be clear everyone is on the same page.  It would be cleanest if everyone could re-initial the first page – whenever you get a chance*.  Finally, Ray should sign the agreement for everyone's records.
>
> ....
>
> Betsey Thelen, Esq.
>
> Gerchen Keller Capital, LLC

Common Ex., Email from Thelen to Hofer dated November 25, 2014, 868, 876, ECF No. 248 (emphasis added).

Grail Semiconductor's creditors, particularly among the NewDelman Group, discussed GKC's request; Higgins signaled his support of, or at least lack of opposition to, the addition of Sedgwick. In an email to Mitchell NewDelman, Higgins stated:

> Here is [the] good news and [the] bad news.  The good news is that we have the final signature.  The bad news is that GKC is suggesting everyone initial page 1 to cover the addition they made to identify Sedgwick.  We do have Ray's [Niro] signature on the agreement, so that is not an issue.
>
> If you would initial page 1 and send it to me, I can add my initials.
>
> Woody [Higgins]

Common Ex., Email from Higgins to NewDelman dated November 28, 2014, 875, ECF No. 248.

Mitchell NewDelman questioned the change and demanded

"transparency between people signing the same agreement; even if it is

an edit."  Common Ex., Email from NewDelman dated November 28, 2014,

875, ECF No. 248.

     Higgins attempted to explain the modification to NewDelman and

Holze:

> I have reviewed the closing documents for this round of
> funding that were supplied to me as a Grail insider.
> Sedgwick FundingCo, LLC is an entity set up by GKC to carry
> out the actual funding.  It is a New York LLC using GKC's
> Chicago address, and Adam Gerchen is identified as its
> Manager in the closing documents.  I do not see that
> identifying them in the Priority Agreement changes our
> distribution priority.
>
> I hope this clarifies the matter.
>
> Woody [Higgins]

Common Ex., Email from Higgins to NewDelman and Holze dated November

29, 2014, 875, ECF No. 248.

     NewDelman was not satisfied by Higgin's explanation.

> Hi Woody,
>
> A few weeks ago, even you insisted in an e-mail that you
> wouldnot [sic] sign off on the Priority Agreement unless
> you understood what you were signing.
>
> If the funding agreement has been signed and performed;
> [sic] how can a NAME simply be added?  GKC is not even
> suggesting that Sedgwick becomea [sic] 'party' to the
> agreement (no signature line) and there is surely
> noconsideration [sic].
>
> Frank [Holze] may well send his own e-mail to you and Ron
> [Hofer] on this 'request' since I simply can neither
> explain the 1) reason nor 2) the economic impact (ifany
> [sic]) nor 3) the affect (if any) such a post execution re-
> initialing have on thevalidity [sic] of the underlying
> agreement.  I just do not get it.  If it has somethingto
> [sic] do with a UCC filing in Illinois, we ought to be
> told.
>
> I believe the best way to solve this is for GKC to writeus
> [sic] a letter on their proper letterhead (signed and
> scanned original; with a postedoriginal [sic] to you);
> explaining that their request is strictly a gratuitous

accommodationto [sic] GKC for internal purposes; and that
they 'represent and warrant' thatthere [sic] will be
absolutely no economic cost to the 'other named individuals
executed the Priority Agreement.

I would also insist that GKC write in the name of the
personwho [sic] executed the Priority Agreement on their
behalf (it is illegible; and theprint [sic] name was left
blank). Likewise, Ron [Hofer] must write in his name where
theblank [sic] for Grail was provided as the
'representation' that he has Board ofDirectors [sic]
authority to execute the Priority Agreement on behalf of
Grail.

...

Cheers

Mitchell [NewDelman]

Common Ex., Email from NewDelman to Higgins dated November 29, 2014,

880, ECF No. 248 (emphasis original).

Frank Holze was similarly not satisfied with Higgins'

explanation.

Hi Mitchell,

...

Something which is not alright, is the fact that GKC
created that specific entity (who are the owners of
Sedgwick? GKC to 100%?) for this particular purpose
probably to put a screen between GKC and Sedgwick and that
is not of concern to the parties of the Priority Agreement,
this is strictly an internal GKC matter. As I told you on
the phone yesterday, I read the CVs of the guys owning and
running GKC, very impressive and I take my hat off, but at
the same time these guys are 'washed with all waters' (a
German expression translated)-so I assume they have found a
very particular and important circumstance AFTER the fact
of doing the deal, that makes it so important to them to
make this addition to the Agreement. THAT is what makes me
raise my eyebrows! Again, as I said earlier, I am not a
lawyer, but I am in business since +45 years, and something
does not smell right to me here. *In my book there is
absolutely no need to make the change to the Agreement*.

...

Frank [Holze]

Common Ex., Email from Holze to NewDelman November 30, 2014, 879, ECF

No. 248 (emphasis original and added).

There is no evidence that NewDelman, Higgins or Holze initialed the addition of the verbiage, i.e., "(including its affiliate, Sedgwick FundingCo, LLC)," to the Priority Agreement, Common Ex., Keller Dep. 1509:19-1510:20, 1512:9-14, 1521:19-1523:5, ECF No. 251; Common Ex., NewDelman Dep. 1138:8-19, ECF No. 251; Common Ex., Higgins Dep. 1470:19-1471:19, ECF No. 251; Common Ex., Holze Dep. 1707:12-1708:14, ECF No. 251; or that GKC was aware of NewDelman and Holze's objection to that verbiage.  Common Ex., NewDelman Dep. 1159:1-1160:17, ECF No. 251; Common Ex., Holze Dep. 1708:14-19, ECF No. 251; Common Ex., Keller decl. 1811:23-25, ECF No. 252; Common Ex., Thelen decl. 1820:5-9, ECF NO. 252.

### E.    Grail Semiconductor, GKC/Sedgwick and the Niro Firm Realize There Won't Be Enough Money to Pay Everyone

Not later than the Spring 2015, GKC and the Niro firm realized that any settlement with Mitsubishi Electric would almost certainly not be sufficient to pay all of Grail Semiconductor's creditors in full. On April 24, 2015, Ashely Keller of GKC sent Ray Niro an email:

> Ray,
>
> You are exactly right.  Below is the priority.  I've also attached a model for you to play with (you can insert different settlement numbers).  *Bottom line, you and GKC are at the top of the waterfall[,] so we need to put pressure on everybody (especially First Class) to be reasonable to reach a deal.*  If we can do that as the first priority parties, so can they.
>
> Even at $100mm there is nothing left if nobody budges.  We need to get everyone comfortable with a settlement in the $40-60mm range....
>
> Ashley [Keller]

Common Ex., Email from Keller to Niro dated April 24, 2015, 885, ECF No. 248 (emphasis added).

Like the Niro firm and GKC, Grail Semiconductor also recognized that full payment of all Grail Semiconductor's creditors from any potential settlement with Mitsubishi Electric was unlikely. Common Ex., Hofer Dep. 1615:2-23, ECF No. 251. Grail Semiconductor doubted that Mitsubishi Electric would settle the litigation in an amount sufficient to pay all creditors; so, it started to pressure some of its creditors to reduce the amounts due them in order to settle the case at the mediation. Common Ex., Gilbert Dep. 1200:13-1201:24, ECF No. 251. Director Gilbert described the pre-mediation discussions in the following manner:

> Q    You had a discussion with Ashley Keller prior to the mediation about GKC taking a haircut, am I correct?
>
> A    Probably more than one.
>
> ...
>
> Q    Now, the first conversation that you had, what do you remember about the substance of the first conversation you had with Ashley Keller and a haircut?
>
> A    Generally,....that it was evident that any settlement that would potentially be reached with Mitsubishi would be inadequate, and there was going to need to be both a pro rata—for him pro rata consideration of reduction of pro rata not in some mathematical sense, but everything was going to take a haircut. And we were going to have to discuss that, and we need to get a handle on everything so we could put a patch together.

Common Ex., Gilbert Dep. 1200:13-1201:24, ECF No. 251; *see also* Common Ex., Keller Dep. 1571:3-19, ECF No. 251.

**F.    The Mitsubishi Electric Action Settles**

On October 5, 2015, on the eve of retrial of the damages phase of the action, the parties mediated the case in San Francisco. Agreed Facts 13:24-14:2, ECF No. 240. Grail Semiconductor's interests were represented by directors Gilbert and Stern, Chief Executive Officer Hofer, and its attorneys; no GKC/Sedgwick representative physically

attended the mediation.  Agreed Facts 13:24-14:2, ECF No. 240.  Ashley

Keller was in San Francisco on the date of the mediation; he did so to

"monitor and keep abreast" and "to provide my perspective['] as well[]

as a consultant to Grail, about the value of the case and what a

prudent risk[-]appropriate settlement value would be."  Agreed Facts

14:3, ECF No. 240; Common Ex., Keller Dep. 1557:11-21, ECF No. 251.

He is "not sure" if he spoke with Grail Semiconductor representatives

by telephone during the mediation.  Common Ex., Keller Dep. 1548:12-

1549:21, ECF No. 251.  Chief Executive Officer Hofer calculated that

he needed a settlement of at least $60 million to pay all creditors.

Common Ex., Hofer Dep. 1615:2-23, ECF No. 251.  Mitsubishi Electric

offered $55 million to settle the dispute.  Chief Executive Officer

Hofer remembers that during the mediation, the Niro firm and Sedgwick

each agreed to reduce their claims by $3 million to make the $55

million settlement offer work.  Common Ex., Hofer Dep. 1616:11-

1617:24, ECF No. 251. Sedgwick denies that it agreed to accept "less

than its full claimed entitlement" outside of a global resolution with

all creditors.  Common Ex., Aff. Keller 1814:13-16, ECF No. 252.  By

close of business that day, Grail Semiconductor and Mitsubishi

Electric settled the Mitsubishi Electric action for $55 million.

Agreed Facts 13:24-14:6, ECF No. 240.

    After the mediation, Keller, Gilbert, and Hofer had a celebratory

drink in the bar of the Fairmont Hotel and discussed the events of the

day.  Common Ex., Keller Dep. 1549:3-1550, ECF No. 251; Common Ex.,

Gilbert Dep. 1202:6-1204:11, ECF No. 251; Common Ex., Woods Dep.

1744:5-1745:16, ECF No. 251.  Woods did not attend the mediation, but

remembers the following colloquy between Ashley Keller and Ron Hofer:

    Q    [Unknown].

...

A    When we got back and we're sitting in the bar, that's
when Ron asked Keller if he was happy with the deal he just
made.  And Keller says something to the effect, 'Oh Ron,
two times our money.  We've only been in this investment,
like, a year.  You know, that's a really good rate of
return when you do it.'

And Ron asked him further the question, something to the
effect about the priority agreement, 'You guys are done.
you made your deal.'

Keller said, 'Yes, that's right.'  Words to that effect.

Q    So Keller agreed to take a $3 million haircut.

...

THE DEPONENT: Right.

...

Q    And at this time, Ashley Keller says that he's happy
with it and that—and *Mr. Hofer confirms that there is no
more money that would be paid to GKC after the $3 million
is taken off*; am I correct?

A    Yep.  Yes.

Common Ex., Woods Dep. 1744:2-1745:16, ECF No. 251 (emphasis added).

**G.    GKC/Sedgwick, Grail Semiconductor, and the Niro Firm Cut
the Side Deal**

After the mediation, discussions between Grail Semiconductor,
acting through director Gilbert, and GKC, acting through Ashely
Keller, continued.  Common Ex., Gilbert Dep. 1202:6-25, ECF No. 251.
On October 7, 2015, Director Gilbert sent Ray Niro and Ashley Keller
an email:

> *[We/I] [h]ad a constructive meeting with attorneys relative
> to the 'action plan.'  There are a few tweaks to the basic
> outline we discussed*, but it appears we can and will make
> this happen with a quick turnaround.  We are targeting a
> board meeting for Wednesday [October 14, 2015] afternoon.
>
> Feel free to call me for any further input and details.
>
> *I ran out of time today to draft the letter agreements we
> discussed*.

> Ashley, not sure where you are geographically....relative
> to time zones, are you available to talk with me live
> tomorrow around 8 AM or 8:30 AM Pacific time?
>
> Rick [Gilbert]

Common Ex., Email from Gilbert to Keller and Niro 916, ECF No. 248

(emphasis added).

October 9, 2015 was a busy day in the life of this dispute. At
the outset, settlement funds from Mitsubishi Electric were deposited
into the Niro firm's trust account. Agreed Facts 14:7-9, ECF No. 240.
On the same day, the Niro firm paid itself $21,450,000 for services
rendered and costs incurred. Agreed Facts 14:11-14, ECF No. 240. Also
on October 9, 2015, Ashley Keller sent Ray Niro of the Niro firm a
demand for full payoff. Grail Semiconductor was not copied on the
email, nor does the record reflect it knew of Sedgwick's demand. The
email read:

> Ray,
>
> Per our discussion, Sedgwick's exact payoff amounts under
> the Forward Purchase Agreement are as follows: if paid
> today [Friday, October 9, 2015], Sedgwick is entitled to
> $12,269,881.61. That number is based on $4,015,725.21
> deployed at a 3x multiple plus $222,705.98 in commitment
> fees on the committed but undeployed amount.
>
> ...
>
> Best,
>
> Ashley [Keller]

Common Ex., Email from Keller to Niro dated October 9, 2015, 921, ECF
No. 248; Agreed Facts 15:3-8, ECF No. 240. For its part, the Niro
firm initiated the wire transfer to GKC Partners II, LLP in the amount
of $12,269,881.61, on October 9, 2015, but it was not completed until
October 13, 2015. Common Ex., Email from McCarthy to Keller dated
October 9, 2015, 927928, ECF No. 248; Agreed Facts 14:15-16, ECF No.

240.[5]

On Monday, October 12, 2015, three days after the wire transfer to GKC Partners II, LLP was initiated but before those funds arrived, director Gilbert sent Ashely Keller, GKC, Paul Aronowitz (Gilbert's personal attorney) and Ray Niro, the Niro firm, an email; it stated:

> Ashley and Tim:
>
> Attached is a rough draft of the agreement *we have been discussing* concerning negotiation and disposition of the amounts payable to GKC upon settlement of the [Mitsubishi Electric] litigation. In the interest of time, I am circulating this draft without input of Tim [Charshaf, counsel for Grail Semiconductor], on behalf of Grail, or from Paul [Aronowitz], on my own behalf. With apologies for the delay in getting this out, I am hoping we can have an acceptable document for presentation to the Grail board [of directors] on Wednesday afternoon.
>
> Note that a similar draft is contemporaneously being sent to Ray Niro.
>
> Rick [Gilbert]

Common Ex., Gilbert email 930, ECF No. 249; Agreed Fact 16:6-10, ECF No. 240.

Attached to the email was a "Letter of Intent" addressed to Ashely C. Keller at GKC:

> This letter will set out the understanding and intent of Grail Semiconductor, Inc. ('Grail') and Gerchen Keller Capital, LLC ('GKC') with respect to certain sums which will become due to GKC from Grail on the occasion of the receipt of proceeds from Grail's pending action against Mitsubishi Electric & [E]lectronics, USA, Inc., now pending in the Superior Court of California in Santa Clara County ('the MEUS Litigation').
>
> This understanding and intent arises from the belief of Grail and GKC that the MEUS Litigation will shortly be resolved by way of compromise. Grail and GKC recognize

---

[5] Over the term of the agreement with GKC, only three of the eight capital advances came from Sedgwick: November 5, 2014; November 13, 2014; and November 20, 2014. Agreed Facts 12:6-14, ECF No. 240. The other five transfers came from GKC Partners II LLP: February 27, 2015; May 28, 2015; August 26, 2015; September 24, 2015; and October 27, 2015. Agreed Facts 12:15-13:5, ECF No. 240.

that there is uncertainty with respect to the nature and
amount of claims of third parties which might be asserted
against the proceeds of such a compromise such that the
ability of Grail to meet all of its creditor obligations
depending upon the amount of such proceeds is subject to
question and, under certain circumstances, could result in
a distribution to GKC of less than the amount to which it
is contractually entitled to receive.

In light of the circumstances, Grail and GKC agree that it
is in the interest of both entities to enter into good
faith negotiations for an agreed-upon reduction of the
amounts currently payable to GKC by Grail in accordance
with its existing funding and other agreements in order to
liquidate such obligation in the best interest of Grail and
GKC.  *It is further agreed that it is in the interests of
both Grail and GKC that, should the MEUS Litigation be
resolved by compromise as anticipated, the full amount due
GKC shall be immediately distributed by Grail to GKC* with
the understanding that GKC warrants and represents that it
shall, at all times during the course of negotiations
required by this Agreement, have sufficient liquid assets
available to refund to Grail the finally negotiated
discount amount within five business days of the formal
approval of such agreement.

*As further consideration of this agreement, GKC agrees that
it will cooperate with Grail in the negotiation and
settlement of competing claims against the proceeds of the
MEUS Litigation.*

Common Ex., Letter of Intent 931-932, ECF No. 249 (emphasis added);

Agreed Facts 16:6-10.

When asked about the Letter of Intent, director Gilbert described

the purpose of the Letter of Intent transmitted to GKC on October 12,

2015.

[The Letter of Intent] was to put in a more formal format
an *agreement that had been made* that we felt the best way
to proceed was to go ahead and pay [GKC's] amount in light
of their status where there's a clear understanding that
they would be negotiating a reduction of that, as we
negotiated the entirety of the creditor claims, in an
attempt to come to a global resolution of those claims.

Common Ex., Gilbert Dep. 1257:10-25, ECF No. 251 (emphasis added).

On October 13, 2015, the Niro firm paid Donald Stern $2,750,000

from its trust account.  Agreed Facts 14:11-15-19, ECF No. 240.

31

On October 14, 2015, at 9:48 a.m., Douglas Gruener, GKC's general counsel, sent an email to director Gilbert; Ashley Keller was copied on the email. It stated: "Richard [Gilbert]: Please find attached a few minor comments to the draft Letter of Intent. Thank you, Douglas G. Gruener[,] Gerchen Keller Capital, LLC." Agreed Facts 16:11-14, ECF No. 240; Common Ex., Gruener Email 937, ECF No. 249. Counsel Gruener's changes softened GKC's agreement to negotiate a post-payment reduction of amounts due. Common Ex., Letter of Intent 940, ECF No. 249 (removing the phrase "an agreed-upon reduction" and qualifying its promise to negotiate a reduction agreement with the parenthetical "(if any)." Notably, Gruener's version of the Letter of Intent recited verbatim the following provisions of Gilbert's draft agreement: (1) that "the full amount due GKC shall be immediately distributed by Grail Semiconductor to GKC"; and (2) GKC's promise to assist in the negotiation and settlement of competing claims. Common Ex., Letter of Intent by Gruener, 940, ECF No. 249.

Later, on October 14, 2015, director Gilbert responded to Gruener:

> I am fine with these changes and will recommend it [the revised Letter of Intent]" to Grail's Board of Directors. *Ray [Niro] wanted language limiting the use of the negotiated refund. He does not want any money going to Grail's usual foibles.* I have proposed some limiting language to him-I felt his [language] was too restrictive and said too much. If that is not a concern to you, I would rather not have it in the agreement, but wanted you to be aware since we had been transparent with respect to our discussions with both GKC and Niro.

Agreed Facts 16:15-22; Common Ex., Gilbert Email 937, ECF No. 249 (emphasis added).

Ashely Keller approved the agreement. On October 14, 2015, at 10:33 a.m. he sent Richard Gilbert an email; the subject line stated,

"Draft Letter of Intent."  It was short, stating simply, "Our language is fine with us.  No further restrictions required."  Common Ex., Keller email to Gilbert dated October 14, 2015, 937, ECF No. 240.

The Letter of Intent was not executed by Grail Semiconductor or GKC/Sedgwick.  Common Ex., Gilbert Dep. 1265:4-9, ECF No. 251; Common Ex., Keller Dep. 1570:4-21, ECF NO. 251.  None of the money paid to GKC was repaid to Grail Semiconductor.  Common Ex., Gilbert Dep. 1265:10-21, ECF No. 251

On October 15, 2015, the Niro firm demanded, and on October 27, 2015, GKC Partners II LLP paid, the Niro firm an additional $498,931.88 for litigation expenses incurred on behalf of Grail Semiconductor.  Agreed Facts 13:4-5, 17:11-17, ECF No. 240.  That post-settlement demand, and disbursement, formed the basis of Sedgwick's original Proof of Claim 12-1, in the amount of $1,496,795.40.[6]

### H.   Grail Semiconductor's Board Meets and the Niro Firm Distributes More Settlement Proceeds

On October 14, 2015, at 3:15 p.m., after the Niro firm had paid itself and Sedgwick, the Grail Semiconductor Board of Directors met. Directors Donald Stern, Robert Stern and Richard Gilbert were present. Ray Niro of the Niro firm and corporate counsel Timothy Charshaf were also present.  Neither GKC, nor Sedgwick, representatives attended the Board of Directors meeting.  The Board ratified the $55 million settlement with Mitsubishi Electric, authorized payment to the Niro firm in the amount of $21,450,000 and to GKC in the amount of

---

[6] Consistent with the terms of Grail's agreement with Sedgwick, disbursements by Sedgwick were to be repaid at three times the amount disbursed.  Common Ex., Prepaid Purchase Agreement §§ 1, 2.5, 0814-0815, February 5, 2021, ECF No. 247; Common Ex., Keller Dep. 1496:14-1502:7, February 5, 2021, ECF No. 251.  Three times $498,931.88 equals $1,496,795.64.  *Compare* Proof of Claim No. 12-1 $1,496,795.40 ($0.24 error).

$12,271,291.00.  Common Ex., Minutes of Special Board Meeting on October 14, 2015, 654, ECF No. 245.  The minutes indicated "Further negotiations will be had with Mr. Niro and GKC regarding a reduction of the fees paid to them and the anticipated return of a portion of those fees."  *Id.*  Those minutes also state "Director Gilbert is authorized to negotiate with 1CL [1st Class Legal] to settle its claims subject to Board approval."  *Id.*  The Board of Directors also approved GKC's offer to act on its behalf to negotiate, settle and advance funds with respect to Grail Semiconductor's remaining creditors:

> The seventh matter before the Board was the need to appoint point persons to negotiate with the corporation's remaining creditors any claims they may have.  Director Gilbert represented to the Board that GKC had agreed to assist in this regard and to negotiate and pay creditors so designated by the corporation from its own funds (to be later credited back to GKC), after Board approval, and that this procedure would be beneficial to the corporation as GKC could offer immediate payment, upon Board approval, in lieu of the creditor having to wait a prolonged period of time to satisfy its claim or for the need of litigation.  The Board also fully discussed the granting of authority to Director Gilbert to negotiate any and all claims against the corporation subject to the Board's approval of any final, proposed terms.  Upon motion duly made, seconded and unanimously approved it was:
>
> RESOLVED: Director Gilbert is authorized to negotiate an arrangement with GKC whereby *GKC will be authorized to negotiate claims with certain creditors so designated by the corporation*, in cooperation with Director Gilbert, *and to pay those creditors* only upon Board approval of any final, proposed terms.  *The corporation will then credit back to GKC any such settlement sum that has Board approval together with any compensation to GKC agreed and approved by the Board*.  Director Gilbert is authorized to negotiate any and all claims against the corporation subject to the Board's approval of any final, proposed terms.

Common Ex., Minutes of Special Meeting of the Board of Directors on October 14, 2015, 654, ECF No. 245 (emphasis added).

On October 16, 2015, the Niro firm paid from its trust account:

(1) Grail Semiconductor the amount of $2,250,000.00; and (2) 1st Class Legal the amount of $14,600,000.00. Agreed Facts 14:19-23, ECF No. 240. After these payments $1,680,118.39 of the Mitsubishi Electric settlement proceeds remained. Agreed Funds 14:24-28, ECF No. 240.

In summary, the Niro firm and GKC/Sedgwick were paid; Third Priority creditors Donald Stern and 1st Class Legal were paid. Grail Semiconductor also received settlement monies. Creditors NewDelman, Holze, and Higgins received nothing.

### I.    Grail Semiconductor files Chapter 11

Grail Semiconductor and Sedgwick's efforts to negotiate resolution of all creditor's claims failed. Agreed Facts 16:4-5, ECF No. 240.

In December 2015, Grail Semiconductor filed a voluntary Chapter 11 petition. Agreed Facts 3:9-11, ECF No. 240. The remaining Mitsubishi Electric litigation settlement proceeds were turned over to Grail Semiconductor, or its estate, shortly after it filed for Chapter 11 protection. Agreed Facts 14:24-27, ECF No. 240.

Shortly thereafter, the case was converted to Chapter 7, and Sheri L. Carello was appointed the trustee. Agreed Facts 3:12-14, ECF No. 240.

As pertinent here, the following parties hold unsecured claims against the estate: Sedgwick $3.5 million; NewDelman $1,732,500; Holze $346,500; and Higgins $1,039,500. Agreed Facts 4:1-5:10, ECF No. 240.

Trustee Carello asserted her avoidance powers. As pertinent here, she filed a preference action against 1st Class Legal. *Carello v. 1st Class Legal (IS) Limited,* No. 17-2249 (Bankr. E.D. Cal. 2017); Common Ex., Adversary Complaint 359-420, ECF No. 244.

At the same time, Carello rattled her saber at Sedgwick

35

FundingCo, LLC, alleging "certain claims" against it.  Common Ex.,

Settlement Agreement between Carello and Sedgwick FundingCo, LLC 402

para. I, ECF No. 244.

Carello and Sedgwick mediated their dispute, which resulted in a

settlement.  Common Ex., Settlement Agreement 401-408, ECF No. 244.

In exchange for a $2.25 million payment, trustee Carello: (1) assigned

her interests in the 1st Class Legal avoidance action to Sedgwick free

and clear of all encumbrances and interests, 11 U.S.C. § 363(f); (2)

increased Sedgwick's Proof of Claim 12-1 to the amount of $3,500,000

(unsecured);[7] and (3) released her claims against Sedgwick.  The

agreement also preserved Sedgwick's rights under the Priority

Agreement:

> 8.  <u>Priority Agreements</u>.  The Parties agree that Sedgwick
> shall be permitted to assert any and all claims, rights and
> causes of action of Sedgwick's that may exist against all
> of the non-Debtor parties to the Priority Agreements,
> subject to the following agreed upon procedure:
>
> > a.   In connection with any legal proceedings with
> > respect to such claims, rights and causes of action,
> > Trustee shall take no position with respect to any
> > prejudgment remedies sought by Sedgwick and Sedgwick's
> > claim that the Priority Agreements are binding, valid
> > and fully enforceable in accordance with their terms;
> >
> > b.   Within 30 calendar days after the Effective
> > Date, Sedgwick shall file an adversary complaint
> > against NewDelman, Holze, Higgins, Hofer, Niro and/or
> > [1st Class Legal] (herein the "Subordinated Parties")
> > seeking declaratory judgment and any other forms of
> > relief with respect to Sedgwick's claim of priority
> > over the Subordinated Parties in connection with the
> > distribution of assets from the Bankruptcy Estate
> > (herein the "Priority Proceedings"); for
> > clarification, the Parties expressly agree that
> > Sedgwick shall not assert any rights, claims or causes
> > of action against Donald S. Stern and/or the Trustee
> > in the Priority Proceedings;
> >
> > c.   Within 30 days prior to any distribution of any

---

[7] The settlement agreement increased Sedgwick's claim from $1,496,795.40, to $3.5 million.  Compare, Proof of Claim No. 12-1 with Proof of Claim No. 12-2.

assets of the Bankruptcy Estate to the holders of allowed claims, the Trustee shall file an interpleader action pursuant to Bankruptcy Rule 7022 whereby such assets shall not be distributed to the Subordinated Parties until completion of, and only to the extent permitted by any orders entered in the Priority Proceedings; and

d.    The Bankruptcy Court shall retain jurisdiction over the Priority Proceedings even in the event that the Bankruptcy Case is closed prior to final adjudication of the Priority Proceedings.

Common Ex., Settlement Agreement § 8, 405, ECF No. 244 (emphasis original).

Trustee Carello moved to approve the compromise, Fed. R. Bankr. P. 9019, and NewDelman, Higgins and Holze opposed approval of the Carello-Sedgwick settlement.  Common Ex., Civil Minutes, 409-420, ECF No. 244.  The court approved the compromise and free and clear sale but specifically provided that (1) the order did not "extinguish or modify" any "claim, defense or right" that any nonparty may have against Sedgwick; (2) trustee Carello would interplead "distributions to be made to Sedgwick"; and (3) ordered that "the Subordinated Parties (as defined in the Settlement Agreement) shall be required to file any Affirmative Claims against Sedgwick as a crossclaim and/or counterclaim in the Priority Proceedings..."  Common Ex., Order Granting Motion to Approve Compromise para. 7(e) 397-399, ECF No. 244 (emphasis original).

In 2016, Raymond P. Niro died and in 2017, the Niro firm ceased operations.  Mot. Approve Settlement at 2, *In re Grail Semiconductor*, No. 15-29890 (Bankr. E.D. Cal. July 5, 2017), ECF No. 742.  Trustee Carello settled her claim with the Estate of Raymond P. Niro and the Niro firm's former shareholders for $1.35 million.  *Id.*  That settlement was approved by this court.  Order, *In re Grail*

*Semiconductor*, No. 15-29890 (Bankr. E.D. Cal. August 4,2017), ECF No. 810.

The trustee has filed her Final Report and, pursuant to order of this court, distributions to be made on account of the Sedgwick and NewDelman Group Proofs of Claim were deposited into the Registry of Funds of the United States Bankruptcy Court for the Eastern District of California in the amount of $2,152,692.63. Agreed Facts 5:21-6:2, ECF No. 240. That figure is comprised of (1) $763,681.75 on account of Sedgwick's Proof of Claim No. 12-2; (2) $708,570.44 on account of Sedgwick's Proof of Claim No. 12-2 under the terms of a settlement between Sedgwick and Ronald Hofer, Sedgwick's former Chief Executive Officer; and (3) $680,440.44 on account of the NewDelman Group's Proofs of Claim Nos. 28-2, 29-2, and 30-2.

**II. PROCEDURE**

Sedgwick filed the instant adversary proceeding for declaratory relief, contending that the Priority Agreement is a valid and enforceable subordination agreement, 11 U.S.C. § 510(a), and entitles it to all funds due the NewDelman Group until such time as its claim is paid in full. Compl., November 1, 2018, ECF No. 1. The NewDelman Group answered, asserting affirmative defenses of unclean hands, estoppel, offset, and in pari delicto, and filed a counterclaim, asserting claims for breach of contract, breach of the implied covenant of good faith and fair dealing, fraud, conversion, constructive trust, unjust enrichment, and civil conspiracy. Am. Answer and Countercl., ECF No. 15.

These cross-motions for summary judgment followed. The parties agree Illinois state law controls, where state law provides the rule of decision. Order, ECF No. 238.

1    **III. JURISDICTION**

2           This court has jurisdiction.  28 U.S.C. §§ 1334(a)-(b), 157(b);

3    *see also* General Order No. 182 of the Eastern District of California.

4    As to the determination of whether Sedgwick or the NewDelman Group is

5    entitled to the funds held by the Clerk of the Court, jurisdiction is

6    core.  28 U.S.C. § 157(b)(2)(A), (B), (O); 11 U.S.C. § 510(a).  As to

7    the court's jurisdiction over state law damages claims against

8    Sedgwick beyond the funds held by the Clerk of the Court, jurisdiction

9    is non-core and supplemental.  28 U.S.C. § 1367.  All parties have

10   consented to entry of final orders and judgments.  28 U.S.C. §

11   157(b)(3); *Wellness Int'l Network, Ltd. v. Sharif*, 135 S.Ct. 1932,

12   1945-46 (2015); Compl. 2:27-28, ECF No. 1 (plaintiff); Order 2:9-28,

13   ECF No. 231 (defendants); *see also* Stipulation of Agreed Facts 6:3-5,

14   ECF No. 240 (plaintiff and defendants).

15   **IV.  LAW**

16          Federal Rule of Civil Procedure 56 requires the court to grant

17   summary judgment on a claim or defense "if the movant shows that there

18   is no genuine dispute as to any material fact and the movant is

19   entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a),

20   *incorporated by* Fed. R. Civ. P. 56.  "[T]he mere existence of some

21   alleged factual dispute between the parties will not defeat an

22   otherwise properly supported motion for summary judgment; the

23   requirement is that there be no genuine issue of material fact."

24   *California v. Campbell*, 138 F.3d 772, 780 (9th Cir. 1998) (citing

25   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)).  "A

26   fact is 'material' when, under the governing substantive law, it could

27   affect the outcome of the case."  *Thrifty Oil Co. v. Bank of Am. Nat'l*

28   *Trust & Sav. Ass'n,* 322 F.3d 1039, 1046 (9th Cir. 2003) (citing

1  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

2      "The court must view the evidence in the light most favorable to

3  the non-movant and draw all reasonable inferences in the non-movant's

4  favor." *Swoger v. Rare Coin Wholesalers*, 803 F.3d 1045, 1047 (9th

5  Cir. 2015) (citing *Clicks Billiards Inc. v. Sixshooters Inc.*, 251 F.3d

6  1252, 1257 (9th Cir. 2001)).

7      A shifting burden of proof applies to motions for summary

8  judgment. *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir.

9  2010). "The moving party initially bears the burden of proving the

10  absence of a genuine issue of material fact." *Id.*

11      "Where the non-moving party [e.g., a plaintiff] bears the burden

12  of proof at trial, the moving party need only prove that there is an

13  absence of evidence to support the non-moving party's case. Where the

14  moving party meets that burden, the burden then shifts to the non-

15  moving party to designate specific facts demonstrating the existence

16  of genuine issues for trial." *Id.* (citation omitted). The Ninth

17  Circuit has explained that the non-moving party's "burden is not a

18  light one.  The non-moving party must show more than the mere

19  existence of a scintilla of evidence." *Id.*  "In fact, the non-moving

20  party must come forth with evidence from which [the factfinder] could

21  reasonably render a verdict in the non-moving party's favor." *Id.*

22      When the moving party has the burden of persuasion at trial

23  (e.g., a plaintiff on claim for relief or a defendant as to an

24  affirmative defense), the moving party's burden at summary judgment is

25  to "establish beyond controversy every essential element of its . . .

26  claim." *S. California Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888

27  (9th Cir. 2003) (internal quotation marks omitted).  In such a case,

28  there is no need to disprove the opponent's case "[i]f the evidence

offered in support of the motion establishes every essential element of the moving party's claim or [affirmative] defense." Hon. Virginia A. Phillips & Hon. Karen L. Stevenson, *Federal Civil Procedure Before Trials, Calif. & 9th Cir. Edit.*, Summary Judgment, Burden of Proof ¶ 14:126.1 (Rutter Group 2019).

A party may support or oppose a motion for summary judgment with affidavits or declarations that are "made on personal knowledge" and that "set out facts that would be admissible in evidence." Fed. R. Civ. P. 56(c)(4). The assertion "that a fact cannot be or is genuinely disputed" may be also supported by citing to other materials in the record or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

"A motion for summary judgment cannot be defeated by mere conclusory allegations unsupported by factual data." *Angel v. Seattle-First Nat'l Bank*, 653 F.2d 1293, 1299 (9th Cir. 1981) (citing *Marks v. U.S. Dep't of Justice*, 578 F.2d 261, 263 (9th Cir. 1978)). "Furthermore, a party cannot manufacture a genuine issue of material fact merely by making assertions in its legal memoranda." *S.A. Empresa de Viacao Aerea Rio Grandense v. Walter Kidde & Co.*, 690 F.2d 1235, 1238 (9th Cir. 1982).

**V.   DISCUSSION**

**A.   Absent an Enforceable Intercreditor Agreement, Entitlement to the Mitsubishi Electric Litigation Proceeds is Controlled by the Uniform Commercial Code**

Without consideration of the effect of the Priority Agreement on the parties' rights, the rights of Sedgwick vis-à-vis the NewDelman Group to the proceeds are unclear. Illinois has adopted the Uniform

41

1   Commercial Code.  810 ILCS § 5/1-101.  Article 9 of the Uniform

2   Commercial Code applies to liens against a cause of action for breach

3   of contract and its proceeds.  810 ILCS § 5/9-109(d)(12).

4        The Uniform Commercial Code specifies the priority of the parties

5   to the proceeds:

> (a)  General priority rules. Except as otherwise provided
> in this Section, priority among conflicting security
> interests and agricultural liens in the same collateral is
> determined according to the following rules:
>
> (1)  Conflicting perfected security interests and
> agricultural liens rank according to priority in time
> of filing or perfection. Priority dates from the
> earlier of the time a filing covering the collateral is
> first made or the security interest or agricultural
> lien is first perfected, if there is no period
> thereafter when there is neither filing nor perfection.
>
> (2)  A perfected security interest or agricultural lien
> has priority over a conflicting unperfected security
> interest or agricultural lien.
>
> (3)  The first security interest or agricultural lien
> to attach or become effective has priority if
> conflicting security interests and agricultural liens
> are unperfected.

17  810 ILCS § 5/9-322(a)

18       A cause of action is a general intangible, White, Summers, &

19  Hillman, *Uniform Commercial Code* § 30:27 (6th ed.) ("Under 9-

20  109(d)(12) if the claim arises in a contract or something other than

21  tort, it is not excluded from Article 9 and is subject to conventional

22  security interest rules as a general intangible").  Here, Grail

23  Semiconductor's rights are contractual and, therefore, are covered by

24  the Uniform Commercial Code.  Ordinarily, a lien against such a cause

25  of action is perfected by filing a financing statement.  810 ILCS §§

26  5/9-310(b), 5/9-315(a)(2).  Sedgwick created, and, on November 4,

27  2014, perfected a security interest in litigation proceeds.  Common

28  Ex., Security Agreement 840, ECF No. 247; Agreed Facts 12:3-5, ECF No.

240.  In contrast, at least Grail Semiconductor considered the April 12, 2012, Amended Fee Agreement naming the NewDelman Group to create a security interest.  Common Ex., Prepaid Forward Purchase Agreement § 3.2 and Schedule 3.2(b) 819, 829, ECF No. 247 (describing the NewDelman Group's interests as encumbrances).  But neither party offers evidence as to whether the NewDelman Group perfected their interest by filing a financing statement.

Even so, a properly executed intercreditor agreement overrides those priorities and allows parties to customize their rights.  "This Article [Article 9] does not preclude subordination by agreement by a person entitled to priority."  810 ILCS § 5/9-339.  Intercreditor agreements define their rights and remedies of creditors vis-à-vis each other with respect to a common debtor.  *Bowling Green Sports Center, Inc., v. G.A.G. LLC*, 413 Ill.Dec. 123, 128 (Ill. App. Ct. 2017); 11 U.S.C. § 510(a); *Sun Life Assurance Co. of Canada v. Great Lakes Business Credit LLC*, 968 F.Supp.2d 898, 910 (N.D. Ill. 2013) (applying Michigan law); Jonathon P. Friedland, *Commercial Bankruptcy Litigation* § 18:1 (January 2021) (such agreements "confirm[] or modif[y] the pre-existing priority rankings of those claims relative to each other...").

### B.    Sedgwick's Claims Against the NewDelman Group: The Priority Agreement

Sedgwick contends that: (1) it—or perhaps GKC on its behalf-- entered a "binding and enforceable" intercreditor agreement, known to the parties as the Priority Agreement, with the NewDelman Group; and (2) that the intercreditor agreement entitles it to be "paid in full" prior to any distribution to NewDelman creditors.  Mot. Summ. J. 1:18-2:1, ECF No. 255.

### 1.   Was the Priority Agreement a contract?

As a rule, bankruptcy courts will enforce intercreditor agreements. "A subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy law." 11 U.S.C. § 510(a); *In re Holiday Mart, Inc.*, 715 F.2d 430, 435 (9th Cir. 1983); *In re Sunset Bay Assocs.*, 944 F.2d 1503, 1508 (9th Cir. 1991). In contrast, a subordination agreement unenforceable under applicable state law is unenforceable in bankruptcy. *In re Sepco, Inc.*, 750 F.2d 51, 53 (8th Cir. 1984).

Illinois follows the common law of contracts. A contract requires: "(1) offer and acceptance; (2) definite and certain terms; (3) consideration; and (4) performance of all required conditions." *Tower Invs., LLC v. 111 E. Chestnut Consultants, Inc.*, 371 Ill. App.3d 1019, 1027 (2007), citing *Zirp–Burnham, LLC v. E. Terrell Associates, Inc.*, 356 Ill.App.3d 590, 600 (2005).

Acceptance has a particular meaning in Illinois law:

> An acceptance may be indicated in various ways, depending on the varying circumstances of each case. If the offer prescribes the mode of acceptance, no contract can result unless the acceptance is made accordingly; if, however, no particular mode of acceptance is specified by the offer, acceptance need not be express or formal, but may be shown by words, conduct, or acquiescence indicating assent to the offer.

12 Romualdo P. Eclavea et al., *Ill. Law and Prac.*, Contracts § 26 (August 2021).

The central contract question is acceptance. GKC was the last signatory to the Priority Agreement; the issue arises out of GKC's addition of the parenthetical "(including its affiliate [Sedgwick Funding Co, LLC]" after the phrase "Second Priority: GKC" and out of

its request for the other creditors to initial that change.

Sedgwick offers two arguments for the validity and enforceability of the Priority Agreement.

### a. The NewDelman Group's acceptance by signed agreement

Sedgwick argues that it, or perhaps GKC on its behalf, accepted the NewDelman Group's offer, i.e., the Priority Agreement. This court disagrees.

> In order to constitute a contract by offer and acceptance, the acceptance must, in every respect, meet and correspond with the offer, neither falling short of nor going beyond the terms of the offer proposed, but exactly meeting them at all points and closing with them just as they stand....However, any definite and seasonal expression of acceptance may operate as an acceptance, even though it is not the mirror image of the offer, unless the acceptance is expressly made conditional on assent to the additional or different terms.

12 Romualdo P. Eclavea et al., *Ill. Law and Prac.*, Contracts § 25 (August 2021).

Illinois law provides that an acceptance that adds new terms does not create a contract but rather is a counter-offer. *Snow v. Schulman*, 352 Ill. 63, 71 (1933); *Finsky, for Use of Finsky v. Odman*, 337 Ill. App. 295, 307 (1949); *Restatement (Second) of Contracts* § 59 (1981).

> Where a person offers to do a definite thing and another accepts it conditionally, or introduces a new term or adds qualifications into the acceptance, the answer is either a mere expression of willingness to negotiate further or is a counterproposal, but in neither case is there a contract. Indeed, a reply to an offer which adds qualifications or requires performance of conditions is not an acceptance.

12 Romualdo P. Eclavea et al., *Ill. Law and Prac.*, Contracts § 28 (August 2021).

Moreover, an offer may only be accepted "by the particular person to whom it is addressed." *Id.*; *Apostolic Revival Tabernacle v.*

45

*Charles J. Fedel, Inc.*, 131 Ill.App.2d 579, 580-581 (1970); *Brook v. Oberlander*, 49 Ill.App.2d 312, 319 (1964). Finally, a switch in the identity of the other party to the contract is a material change in the terms of the offer, such that a contract may not be formed by mere acceptance with change of the identity of the opposing party. As one court said, "'To constitute a valid contract, the minds of the parties must have met on the identity of persons with whom they are dealing. *Everyone has a right to select and determine with whom he will contract[,] and another cannot be thrust upon him without his consent.'*" *Davito v. Blakely*, 96 Ill.App.2d 196, 201 (1968), quoting 12 *Am.Jur.* Contracts, Sec. 38 (emphasis added); *Apostolic Revival Tabernacle v. Charles J. Fedel, Inc.*, 131 Ill.App.2d 579, 580-581 (1970).

Here, as a matter of law, Sedgwick cannot accept an offer made to GKC. *Apostolic Revival Tabernacle*, 131 Ill.2d at 580; *Brook*, 49 Ill.App.2d at 320. Moreover, GKC's argument that its effort to accept created a third-party beneficiary contract for Sedgwick's benefit is not convincing. Even if Sedgwick could evade the rule that the NewDelman Group had "the right to choose the person with whom [it] deals," *Brook*, 49 Ill.App.2d at 319, Betsy Thelen's reply created a counteroffer, which itself must be accepted. Common Ex., Email from Thelen to Hofer November 26, 2014, 868, 876, ECF No. 248. Thelen acknowledged this by asking the parties to initial the change. Viewed through the lens of hindsight, we know that Mitchell NewDelman and Frank Holze objected, albeit without informing GKC, to the change in the cast of players. Common Ex., Email from NewDelman to Higgins dated November 29, 2014, 880, ECF No. 248; Common Ex., Email from Holze to NewDelman November 30, 2014, 879, ECF No. 248. We also know

that the members of the NewDelman Group did not initial the addition

of Sedgwick.  Common Ex., Keller Dep. 1509:19-1510:20, 1512:9-14,

1521:19-1523:5, ECF No. 251; Common Ex., NewDelman Dep. 1138:8-19, ECF

No. 251; Common Ex., Higgins Dep. 1470:19-1471:19, ECF No. 251; Common

Ex., Holze Dep. 1708:1-14, ECF No. 251.

It is possible that the Priority Agreement could have been

accepted by another method.  While an offer may specify the method of

acceptance, *Brach v. Matteson*, 298 Ill. 387, 392 (1921), Betsey

Thelen's email indicating that it would be "cleanest if everyone could

re-initial the first page," does not rise to that level.  As a result,

the counter-offer, i.e., adding ("including its affiliate, Sedgwick

FundingCo, LLC") could be accepted orally or inferred from conduct.

*Anglo-American Provision Co. v. Prentiss*, 157 Ill. 506, 42 N.E. 157

(1895); *Finsky, for Use of Finsky v. Odman*, 337 Ill. App. 295 (1949);

*Bloch v. J. Stern & Sons*, 152 Ill. App. 434 (1910); *Northwestern Iron*

*& Metal Co. v. Hirsch*, 94 Ill. App. 579 (1901).  Here, there is

insufficient evidence for the court to determine whether the revised

Priority Agreement was accepted by a method other than execution.

**b.    The NewDelman Group's deemed acceptance by judicial admission**

Sedgwick also contends that the NewDelman Group has made judicial

admissions as to the validity of the agreement.  This court disagrees.

Federal law governs application of judicial admission in federal

courts.  *Rissetto v. Plumbers and Steamfitters Local 343*, 94 F.3d 597,

603 (9th Cir. 1996).  "Judicial admissions are more than evidentiary

admissions. They have the effect of removing the admitted fact from

issue and wholly dispensing with the necessity for proof of the fact."

Robert E. Jones et al., *Federal Civil Trials and Evidence* § 8:982

(Rutter Group June 2021), citing *American Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988); *Barnes v. Owens-Corning Fiberglas Corp.*, 201 F.3d 815, 829 (6th Cir. 2000); *Selimi v. I.N.S.*, 312 F.3d 854, 860 (7th Cir. 2002). "A trial judge has discretion whether to accept a judicial admission." *Singer v. State Farm Mut. Auto. Ins. Co.*, 116 F.3d 373, 376 (9th Cir. 1997). The existence of contrary evidence and the absence of prejudice is a sound reason to decline to invoke that doctrine. *Nash-Perry v. City of Bakersfield*, 2021 WL 3883681 *8 (E.D. Cal. August 31, 2021) ("Given the contrary evidence presented, the Court finds the allegations related to Z.S. did not "dispens[e] wholly with the need of proof for the fact," and the defense did not rely upon these allegations"), citing *Singer*, 116 F.3d at 376-77 (uphold invocation of judicial admission "[i]n the absence of any conflicting evidence"); *Parker v. Arizona*, 2019 WL 2136290 at *3 (D. Ariz. May 13, 2019) (refusing to apply the doctrine where the admission was made "during the early stages of the case" as judicial admissions). Given contrary evidence, this court will not deem the NewDelman Group's responses judicial admissions as to the validity of the contract.

> **2. As a Matter of Law Implied Subordination Agreements Do Not Exist.**

Sedgwick argues that "[e]ven if the Priority Agreement was not an enforceable contract" that "it still would be the case that an implied contracts exits." Mem. P. & A. 24:12-15, ECF No. 257.

This court disagrees. The Uniform Commercial Code requires that subordination agreements be express. 810 ILCS § 5/9-339, Official Comment ("[o]nly the person entitled to priority may make such an agreement: a person's rights cannot be adversely affected by an

agreement to which the person is not a party"); *In re Lunan Fam.*

*Restaurants*, 194 B.R. 429, 444 (Bankr. N.D. Ill. 1996) ("By executing

a lien subordination agreement, the subordinating party agrees to

demote the priority of its lien to that of another secured

creditor...") (quoting *In re Lantana Motel*, 124 B.R. 252, 256 (Bankr.

S.D. Ohio 1990); *W. Bank v. Matherly*, 1987-NMSC-052, ¶ 11, 106 N.M.

31, 33, 738 P.2d 903, 906 ("[a] subordination agreement by implication

is not recognized; it must be expressed. 69 Am.Jur.2d Secured

Transactions § 478 (1973)").

> **3. Does the Priority Agreement require payment to Sedgwick in full first or payment to all signatory creditors simultaneously and at equal pace?**

If the Priority Agreement was, in fact, accepted and, therefore,

is a binding contract, the parties disagree as to its meaning.  The

agreement purports to do two things: (1) control timing of payment,

i.e., "priority" vs. "concomitantly" (the "timing clause"); and (2)

define the parties' precedence to settlement proceeds vis-à-vis each

other (the "precedence provisions") in the event of an insufficiency

of funds.  Sedgwick contends that each class of creditors bearing a

lower numerical designation, e.g., "second priority," must be paid in

full before any settlement funds flow to a creditor with a higher

numerical designation, e.g., "third priority."  Mem. P. & A. 25:8-

26:18, ECF No. 257.  The NewDelman Group contends that settlement

funds be distributed among second and third priority creditors

simultaneously and at an equal pace.  Respon. to Mot. Summ. J. 11:1-

12:13, ECF No. 270.  The difference in construction determines the

timing of payment and identifies which party bears the risk that

settlement funds will be insufficient to pay all creditors.  Under

Sedgwick's interpretation, Third Priority creditors wholly bear the

risk of insufficiency; under the NewDelman Group's construction, the
risk is shared by second priority and third priority creditors.

In construing the Priority Agreement, the central question is the
intention of the parties. *Farmers Auto. Ins. Ass'n v. Wroblewski*, 320
Ill.Dec. 772 (2008). In determining the parties' intent, the State of
Illinois follows the "four corners rule." That rule provides: "An
agreement, when reduced to writing, must be presumed to speak the
intention of the parties who signed it. It speaks for itself, and the
intention with which it was executed must be determined from the
language used. It is not to be changed by extrinsic evidence." *W.
Ill. Oil Co. v. Thompson*, 26 Ill.2d 287, 291 (1962); *URS Corp. v. Ash*,
101 Ill.App.3d 229, 234 (1981). The Illinois Supreme Court has
consistently followed this rule and has summarized its application.

> In applying this rule, a court initially looks to the
> language of a contract alone. *If the language of the
> contract is facially unambiguous, then the contract is
> interpreted by the trial court as a matter of law without
> the use of parol evidence.* If, however, the trial court
> finds that the language of the contract is susceptible to
> more than one meaning, then an ambiguity is present. Only
> then may parol evidence be admitted to aid the trier of
> fact in resolving the ambiguity.

*Air Safety, Inc. v. Tchrs. Realty Corp.*, 185 Ill.2d 457, 462–63 (1999)
(internal citations omitted) (emphasis added).

Using this approach, the starting point is whether ambiguity
exits. As one commentator articulated it:

> An ambiguous contract is one capable of being understood in
> more senses than one; it is an agreement obscure in meaning
> through indefiniteness of expression, or having a double
> meaning. *A contract term is ambiguous if it can reasonably
> be interpreted in more than one way due to the
> indefiniteness of the language or a double or multiple
> meaning.* In other words, a contract is ambiguous if, and
> only if, it is reasonably or fairly susceptible to
> different constructions when read in its plain and ordinary
> meaning.

12A Romualdo P. Eclavea et al., *Ill. Law and Prac.*, Contracts § 126 (October 2021) (emphasis added).

Unless and until the court finds the contract ambiguous, the court may not resort to the rules of construction, *Gibbs v. People's Nat. Bank*, 198 Ill. 307, 312 (1902); 12A Romualdo P. Eclavea et al., *Ill. Law and Prac.*, Contracts §§ 124-165 (October 2021) (describing rules of construction); or admit parol evidence. *Shields Pork Plus, Inc. v. Swiss Valley Ag Service*, 329 Ill.App.3d 305, 310-311 (2002).

The agreement is unambiguous as applied to the Niro firm and to Grail Semiconductor; neither party contends otherwise. As to the Niro firm, the Priority Agreement only amended the last sentence of paragraph 5 of the Amended Fee Agreement. Common Ex., Priority Agreement 754-756, ECF No. 246. But the second to the last sentence of the Amended Fee Agreement was not altered by the Priority Agreement. It provided:

> This payment obligation of Grail is not intended to and does not amend, lessen or supersede the determination of the amount and timing of our firm's compensation or reimbursement of expenses from each Recovery and that any payment made to 1st Class Legal or to the order of each of the above named individuals pursuant to paragraph 5 shall not reduce or delay payments for our firm's services or reimbursement of expenses.

Common Ex., Amended Fee Agreement dated April 10, 2012, ¶ 4, 717, ECF No. 246.

Similarly, the Priority Agreement is unambiguous as to Grail Semiconductor's rights; the agreement provided that it received only the "[t]he remaining balance of the gross [r]ecoveries." Common Ex., Priority Agreement 754-756, ECF No. 246.

The more difficult problem is whether the Priority Agreement is ambiguous as to the "Second Priority" (GKC/Sedgwick) and the "Third

Priority" (the NewDelman Group) creditors.  The precise question is:
does the phrase "Second Priority" as applied to payment to GKC and the
word "concomitantly" and/or the phrase in "pari passu" as applied to
payment to the NewDelman Group create an ambiguity such that the court
should consider parol evidence or apply the rules of construction?
Two principles guide this court's inquiry into whether an ambiguity
exists.  First, ostensible ambiguities must be reasonable and
plausible, *Paul B. Episcope, Ltd. v. L. Offs. of Campbell & Di
Vincenzo*, 373 Ill. App.3d 384, 391 (2007), as modified on denial of
reh'g (May 29, 2007), and "[t]he interpretation of the party
contending for ambiguity needs to be equally plausible to the
construction of the party arguing the contract is unambiguous."  Id.
(emphasis added).

　　　Second, the court must consider the document as a whole, rather
than isolated portions or words.  "[I]n determining whether or not
there is such an ambiguity as calls for an interpretation of a
contract the whole instrument must be considered and not an isolated
part thereof." *Wilkin v. Citizens Nat. Bank of Paris*, 298 Ill.App. 38,
44 (1938); *West v. Ranney Refrigerator Co.*, 261 Ill. 560, 564 (1914).

　　　"It is a familiar principle of contract construction that the
words used be given their ordinary, natural and commonly accepted
meaning unless it clearly appears that the parties intended to ascribe
to them a peculiar or unusual meaning." *First Nat. Bank of La Grange
v. Mid-States Eng'g & Sales, Inc.*, 103 Ill.App.3d 572, 574 (1981),
citing *Illinois Valley Asphalt, Inc. v. La Salle National Bank*, 54
Ill.App.3d 317, 321, (1977).

　　　Here, the timing clause and the precedence provisions clash
beyond reconciliation rendering the Priority Agreement ambiguous.

52

Priority means "(1) "the quality or state of being prior"; or (2) "legal precedence in exercise of rights over the same subject matter" and "a preferential rating: especially: one that allocates rights to goods and services usually in limited supply." *Webster's New Explorer Encyclopedic Dictionary* 1455 (2006). Such a definition suggests precedence in time and in right. In contrast, functioning as an adverb, "concomitantly" means "something that accompanies or is collaterally connected with something else," *Webster's New Explorer Encyclopedic Dictionary* 374 (2006), and "by percentages pari passu with "the above named individuals" means "at an equal rate or pace," Id. at 1328.

Having concluded that the agreement is ambiguous, the court may consider parol evidence.

> Generally, if a contract in writing is so ambiguous or
> obscure in its terms that the contractual intentions of the
> parties cannot be understood from a mere inspection of the
> instrument, extrinsic evidence of the subject matter, of
> the relationship of the parties to each other, and of the
> facts and circumstances surrounding them when they entered
> into the contract, may be received to enable the court to
> make a proper interpretation of the instrument.

12A Romualdo P. Eclavea et al., *Ill. Law and Prac.*, Contracts § 168 (October 2021).

Here, two key species of parol evidence inform the court's decision and cut in opposite directions. First, where a contract is ambiguous courts may consider preliminary discussions by the parties:

> Generally, the intention of the parties is not to be
> determined from previous understandings or agreements, but
> from the instrument[,] which is executed as their final
> agreement, otherwise written evidence of an agreement would
> amount to nothing. *Even though an instrument is executed
> independently of any prior agreement of larger scope,
> however, other agreements preceding its execution may
> sometimes be considered in order to determine the intention
> of the parties in their use of specific words or clauses.*

*Thus, as part of the parol evidence to interpret an ambiguous contract, a court may consider preliminary negotiations between the parties in order to determine the meaning of contract provisions and the intent of the parties.*

12A Romualdo P. Eclavea et al., *Ill. Law and Prac.*, Contracts § 133 (October 2021) (emphasis added).

Second, the court may consider the parties' actions with respect to the contract:

Where the terms of a written agreement are in any respect ambiguous, uncertain, or doubtful, and the parties have by their own acts and conduct placed a practical construction on the provisions of the contract, evidence of their acts or conduct is admissible to enable the court to determine the intention of the parties at the time the contract was made, and it makes no difference whether such acts are contemporaneous or subsequent....*Courts have a right to assume that the parties know best what they meant, and, if, in reducing their agreement to writing, words or terms have been used that render the contract ambiguous or uncertain, the construction by the parties thereto, as shown by their acts thereunder, cannot help but be of value in ascertaining the true intent and meaning of such contract.*

12A Romualdo P. Eclavea et al., *Ill. Law and Prac.*, Contracts § 169 (October 2021) (emphasis added).

There is a genuine dispute about the material facts pertaining to the timing and the relative right of GKC/Sedgwick and the NewDelman Group as to settlement proceeds in the event of insufficiency. Some evidence suggests GKC/Sedgwick's reading. For example, the Forward Purchase Agreement (between Grail Semiconductor and GKC/Sedgwick only) and the Niro firm's actions in paying not only itself but also GKC/Sedgwick, while withholding payment to Third Priority creditors, suggests that Sedgwick's construction of the Priority Agreement is correct. Other evidence, such GKC/Sedgwick's execution of the Higgins draft Priority Agreement, without objection to the reordering of priorities to proceeds, and the post-settlement Letter of Intent

negotiated by Grail Semiconductor and GKC/Sedgwick after settlement
(which would be redundant under Sedgwick's construction), are indicia
that the NewDelman construction more accurately reflects the intention
of the parties.  For these reasons, a genuine dispute of facts exits,
and summary judgment will be denied as to the interpretation of the
Priority Agreement.

For these reasons, Sedgwick's motion and the NewDelman Group's
motions will be denied.[8]

### C.    The NewDelman Group's Counterclaim Against Sedgwick: Breach of Contract and Tort Claims

Notwithstanding that this court has ruled that Sedgwick has not
demonstrated that the Priority Agreement was accepted, as to the
issues raised by the NewDelman Group's counterclaim, this court finds
that Sedgwick is judicially estopped from denying the binding nature
of the Priority Agreement.[9]  *New Hampshire v. Maine*, 532 U.S. 742, 750
(2001) (three factor test: (1) inconsistent positions; (2) success in
prior proceeding; and (3) unfairness); *Baughman v. Walt Disney*, 685
F.3d 1131, 1133 (9th Cir. 2012).  Here, Sedgwick convinced the court

---

[8] Sedgwick's request to summarily adjudicate the NewDelman Group's 22
affirmative defenses is denied.  Local Bankruptcy Rule 9014-1(d)(3)(C)
requires that the memorandum of points and authorities provide "a succinct
and reasoned explanation of the moving party's entitlement to relief."
Sedgwick's memorandum of points and authorities misstates the applicable
burden of proof; at the outset it allocates it to the defendants.  Mem. P. &
A. 27:9-28:2, ECF No. 257.  Correctly stated, "Where the non-moving party
[e.g., defendant] bears the burden of proof at trial, the moving party need
only prove that there is an absence of evidence to support the non-moving
party's case. Where the moving party meets that burden, the burden then
shifts to the non-moving party to designate specific facts demonstrating the
existence of genuine issues for trial."  In re Oracle Corp. Sec. Litig., 627
F.3d 376, 387 (9th Cir. 2010).  Without reference to any of the 105
Undisputed Facts offered in support of its motion, it states that the
NewDelman Group "has not identified any valid affirmative defense" to the
complaint. Mem. P. & A. 27:9-10, ECF No. 257.  This is insufficient and the
motion will be denied.

[9] As to the binding nature of the Priority Agreement, the court declines to
apply judicial estoppel against the NewDelman Group.

to sequester funds due the NewDelman Group based on representations of the existence of an intercreditor agreement.  Having done so, Sedgwick cannot now deny the binding nature of that agreement.  Common Ex., Order Granting Motion to Approve Compromise para. 7(e) 397-399, ECF No. 244 (wherein the court sequestered funds based on Sedgwick's claims as to their priority under the intercreditor agreement).

### 1.   Overshadowing issues

Sedgwick advances two preemptive arguments: (a) the NewDelman Group's claims against it are derivative, and that the Chapter 7 trustee is the proper party in interest; and (b) payment of the proceeds under the Priority Agreement would have been avoided as a preferential transfer, which bars the NewDelman Group's action.  This court has previously resolved each of these arguments against Sedgwick.  Mem. 2:8-7:25, ECF No. 51.

### a.   Standing

The NewDelman Group's claims against Sedgwick are direct, not derivative and, even if they were derivative, the NewDelman Group is entitled to pursue them, *Estate of Spirtos v. One San Bernadino County Superior Court Case No. SPR02211*, 443 F.3d 1172 (9th Cir. 2006); *CAMOFI Master LDC v. Associated Third Party Administrators*, 2018 WL 839134 *3 (N.D. Cal. February 13, 2018).  As a rule, Chapter 7 trustees have the exclusive right to assert avoidance actions, e.g., 11 U.S.C. §§ 544, 545, 547-549, and those actions that are derivative, i.e., "if the gravamen of the complaint is injury to the corporation, or to the whole body of its stock or property...or if it seeks to recover assets of the corporation or to prevent the dissipation of its assets." *CAMOFI Master LDC*, 2018 WL 839134 *4.  In contrast, creditors retain the right to pursue direction actions, that is those

"where the plaintiff's injuries 'were not incidental to the damages to the corporation." *Id.* Here, The NewDelman Group's claims arise out of an intercreditor agreement and are direct.

But even if the claims are derivative, the NewDelman Group may pursue them. At the outset, the trustee has consented to the NewDelman Group prosecuting these claims. *Estate of Spirtos*, 443 F.3d at 1175 (trustee may consent to suit by creditors); *Avalanche Mar., Ltd. v. Parekh (In re Parmetex, Inc.)*, 199 F.3d 1029, 1031 (9th Cir. 1999). And the trustee consented to, and the court approved, creditors' pursuit of their claims against Sedgwick. Common Ex., Order Granting Motion to Approve Compromise para. 7(e) 397-399, ECF No. 244 ("the Subordinated Parties (as defined in the Settlement Agreement) shall be required to file any Affirmative Claims Against Sedgwick as a crossclaim and/or counterclaim in the Priority Proceedings...").

Moreover, even if the consent was ineffective, the estate no longer has any interest in these claims. As a rule, scheduled property of the estate revests in the debtor when the case closed. 11 U.S.C. § 554(c); *Stevens v. Whitmore (In re Steve*ns), 15 F.4th 1214 (9th Cir. 2021). Here, the debtor did schedule claims against GKC. Schedule A/B Item 75, ECF No. 80. Grail Semiconductor's estate is closes. Final Decree, ECF No. 1440. For each of these reasons, the NewDelman Group has standing.

### b.    Avoidable preferences

There is no authority for the proposition that voidability, e.g., as a preferential transfer, 11 U.S.C. § 547, constitutes a defense to state law contract and/or tort actions. That payment to the NewDelman Group after the settlement with Mitsubishi Electric would be a

voidable preference is almost a certainty.  11 U.S.C. § 547(b);

*Compare In re Lewis W. Shurtleff, Inc.*, 778 F.2d 1416, 1421 (9th Cir.

1985) ("as long as the distribution in bankruptcy is less than one-

hundred percent, any payment "on account" to an unsecured creditor

during the preference period will enable that creditor to receive more

than he would have received in liquidation had the payment not been

made"), *with* Trustee's Final Report, ECF No. 1436) (creditors received

a 20.52% dividend).  Affirmative defenses to such a preferential

payment appear inapplicable.  11 U.S.C. § 547(c).

Beyond that, since this in the nature of an affirmative defense,

Fed. R. Civ. P. 8, *incorporated by* Fed. R. Bankr. P. 7008, Sedgwick

bears the initial burden of proof.  *S. California Gas Co. v. City of

Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003).  That a preference, even

a large one, exists is not evidence that the trustee would have

actually avoided it.  The Chapter 7 trustee has discretion with

respect to pursuing, or refusing to pursue, avoidance actions.  *Matter

of Taxman Clothing Co.*, 49 F.3d 310, 315 (7th Cir. 1995); *In re V.

Savino Oil & Heating Co.*, 91 B.R. 655, 656 (Bankr.E.D.N.Y.1988).

("[t]he commencement of litigation by a trustee or debtor-in-

possession on behalf of an estate in bankruptcy under the avoidance

provisions is permissive and not mandatory").  The decision to pursue

a preference action involves a careful weighing of the risks and costs

against the prospects of recovery:

> Such a decision involves weighing a myriad of factors and
> often requires making the decision at a time when not all
> of the factual inputs are available and when the estate
> does not have money available to conduct an expansive
> investigation of the facts. *These factors include: the
> factual and legal merits of the prospective action; the
> probable value of the recovery to the estate; the probable
> cost of the action to the estate.* In making a decision, *a
> trustee*, cognizant of his fiduciary role, *must avoid*

> spurious lawsuits as well as those which, while *having
> theoretical legal merit, would be unduly expensive to the
> estate, involve undue risk to the estate or likely result
> in minimal recovery for the estate.*

*In re Haugen Const. Serv., Inc.*, 104 B.R. 233, 240-41 (Bankr. D.N.D.
1989) (emphasis added), citing *In re Acadiana Elec. Service, Inc.*, 66
B.R. 164, 165 (Bankr. W.D.La.1986).

Here, there has been no showing that trustee Carello would have
attempted to avoid such a payment.  And Trustee Carello may not so
testify.  Fed. R. Evid. 611 (speculation); Common Ex., Settlement
Agreement § 8(a) 405, ECF No. 244 ("Trustee shall take no position
with respect to any prejudgment remedies sought by Sedgwick").
Finally, that two of the three members of the NewDelman Group reside
in the Principality of Monaco, Agreed Facts 3:19-22, ECF No. 240,
suggests difficulties in collection that may well have been the
deciding factor in a decision to forego avoidance.

For these reasons the NewDelman Group's motion will be granted as
to standing and the preference issues; Sedgwick's motion will be
denied.

### 2.   Breach of contract

In the State of Illinois, a breach of contract claim requires
that the plaintiff plead and prove: "(1) the existence of a valid and
enforceable contract; (2) substantial performance by the plaintiff;
(3) a breach by the defendant; and (4) resultant damages." *W.W.
Vincent & Co. v. First Colony Life Ins. Co.*, 351 Ill.App.3d 752, 759
(2004), citing *Gonzalzles v. American Express Credit Corp.*, 315
Ill.App.3d 199, 206 (2000).

Assuming that the Priority Agreement bound the parties, the Niro
firm was contractually obligated to disburse in a manner consistent

with its terms, however that is eventually construed; Sedgwick was not so obligated.

Absent ambiguity, a party's contractual duties under a written agreement are defined by the writing. *Air Safety, Inc. v. Tchrs. Realty Corp.*, 185 Ill.2d 457, 462–63 (1999); *Martindell v. Lake Shore Nat. Bank*, 15 Ill.2d 272, 283 (1958); *People v. Dummer*, 274 Ill. 637, 640 (1916) (a contract is "an agreement....to do or not to do a particular thing"); *Landretto v. First Trust & Sav. Bank of Chicago*, 333 Ill. 442 (1928); 12A Romualdo P. Eclavea et al., *Ill. Law and Prac.*, Contracts § 240 (October 2021) ("[a]s a general rule, the parties to a valid contract are bound to perform it *according to its terms*") (emphasis added).

Assuming that it does, in fact, bind the parties and that the NewDelman Group's construction is correct, the Priority Agreement contained two covenants: (1) an allocation of the Mitsubishi Electric litigation proceeds among specified creditors; and (2) payment of those amounts "directly by Niro, Haller and Niro from their trust account" to those creditors. Common Ex., Priority Agreement 754-756, ECF No. 246. All signatories to the agreement agreed to the allocation of proceeds; the Niro firm, and only the Niro firm, agreed to undertake distribution to creditors from the Niro firm's trust account. GKC/Sedgwick never promised to undertake proceeds distribution.

Implicit in the NewDelman Group's argument is that GKC/Sedgwick's execution of the Priority Agreement renders it jointly and severally liable for the Niro firm's breach of the Priority Agreement. Certainly, the State of Illinois recognizes joint and several contractual liability where the signatories to an agreement so intend.

*Midland Credit Adjustment Co. v. Donnelley*, 219 Ill.App. 271 (1920);
*Brokerage Resources, Inc. v. Jordan*, 80 Ill.App.3d 605, 608-610
(1980); *Pritchett v. Asbestos Claims Management Corp.*, 332 Ill.App.3d
890, 898 (2002).

A necessary, but not sufficient, condition for imposing joint and
several liability is two or more parties promising the same
performance to a third party. *Brokerage Resources*, 80 Ill.App.3d at
608 ("If two or more parties to a contract owe a joint and several
duty..."); *Pritchett*, 332 Ill.App.3d at 898; *Flynn v. Levy*, 832
F.Supp.2d 951, 956 (N.D. Ill. 2011) ("Unlike co-signors on a
promissory note, or parties to mortgage agreements or apartment
leases, where the parties agree to be jointly liable for a financial
obligation, nothing in the Shareholders' Agreement supports
Plaintiffs' position that it created anything other than an individual
obligation"); *Becka v. Dieterich*, 2015 WL 1887844 *4 (N.D. Ill. April
24, 2015) ("Here, the language of the Retainer Agreements reflects a
joint promise among 'Clients' to pay Becka all legal fees incurred in
the two actions"); *Restatement (Second) Contracts* § 288(1)
(1981)("Where two or more parties to a contract make a promise or
promises to the same promisee, the manifested intention of the parties
determines whether they promise that the same performance or separate
performances shall be given").

The question of whether a contract contains the same or separate
promises is entirely one of contract interpretation. *See Filosa v.
Pecora*, 18 Ill.App.3d 123 (1974); *Combs v. Steele*, 80 Ill. 101 (1875)
("Contracts will be construed to be joint or several, as the case may
be, where the intent of the respective parties appears on the face of
the obligations, and that construction will be adopted which is most

1   consistent with the words employed to express the undertaking of the

2   several parties"); *Corrington v. Pierce*, 28 Ill.App. 211 (1988). As

3   the Restatement of Contracts explained it,

4           The question whether two promisors promise the same or
            separate performances is distinct from the question whether
5           two promisors of the same performance are bound by "joint"
            or by "several" duties or by both, but the two questions
6           are sometimes confused. *The question of what performances
            are promised is entirely a question of interpretation of
7           the promises*, while the distinction between "joint" and
            "several" duties is primarily remedial and procedural and
8           is substantially abolished by statute in many
            jurisdictions.
9

10  *Restatement (Second) Contracts* § 288, cmt. b (1981) (emphasis added).

11          Having concluded that the Niro firm alone was to distribute

12  litigation proceeds, the requisite same promise is absent, and

13  GKC/Sedgwick may not be held liable, at least directly, for Niro's

14  breach of contract.

15          For these reasons, Sedgwick's motion will be granted, and the

16  NewDelman Group's motion will be denied.

17                  **3.    Breach of the implied covenant of good faith and fair
                            dealing**
18

19          The covenant of good faith and fair dealing does not impose

20  duties that do not otherwise exist under the contract:

21          Every contract contains an implied covenant of good faith
            and fair dealing. The obligation of good faith and fair
22          dealing is essentially used to determine the intent of the
            parties where a contract is susceptible to two conflicting
23          constructions. Problems involving the obligation of good
            faith and fair dealing generally arise where one party to a
24          contract is given broad discretion in performance. The
            covenant of good faith requires that a party vested with
25          contractual discretion exercise that discretion reasonably,
            not arbitrarily, capriciously, or in a manner inconsistent
26          with the reasonable expectation of the parties. *Parties to
            a contract, however, are entitled to enforce the terms of
27          the contract to the letter and an implied covenant of good
            faith cannot overrule or modify the express terms of a
28          contract*.

                                        62

*N. Tr. Co. v. VIII S. Michigan Assocs.*, 276 Ill.App.3d 355, 367 (1995) (internal citation omitted) (emphasis added).

It is not "an independent source of duties for the parties to a contract." *Baxter Healthcare Corp. v. O.R. Concepts, Inc.*, 69 F.3d 785, 792 (7th Cir. 1995) (interpreting Illinois law); *Brooklyn Bagel Boys, Inc. v. Earthgrains Refrigerated Dough Prod., Inc.*, 212 F.3d 373, 381 (7th Cir. 2000).

Having ruled that GKC/Sedgwick was not contractually obligated to disburse settlement funds under the contract, it may not now be held to answer for the Niro firm's failure to do so. As a result, Sedgwick is entitled to summary judgment on that issue.

For these reasons, Sedgwick's motion will be granted, and the NewDelman Group's motion will be denied.

### 4. Conversion

A plaintiff alleging conversion must prove: "(1) his right to the property; (2) that this right includes the absolute, unconditional right to immediate possession of the property; (3) he has demanded possession of the property; and (4) the defendant took control or claimed ownership of the property wrongfully and without authorization." *MacNeil Auto. Prod., Ltd. v. Cannon Auto. Ltd.*, 715 F. Supp.2d 786, 796 (N.D. Ill. 2010), quoting *Edwards v. City of Chi.*, 389 Ill.App.3d 350, 353 (2009).

Two particular issues of law are worthy of note. First, Illinois recognizes conversion of money under some circumstances. "Money may be the subject of conversion, but it must be capable of being described as a specific fund or chattel although it need not be specifically earmarked." 34A David S. Taber, *Ill. Law and Prac.*, Trover and Conversion § 7 (October 2021); *3Com Corp. v. Electronics*

*Recovery Specialists, Inc.*, 104 F.Supp.2d 932, 940 (N.D. Ill. 2000);

*Horbach v. Kaczmarek*, 934 F. Supp. 981, 986 (N.D. Ill. 1996), decision

aff'd, 288 F.3d 969 (7th Cir. 2002).  Illinois courts have long

understood that an agreement that distributes funds from a segregated,

i.e., trust, account in a specific amount or percentage is sufficient

to support a claim for conversion.  *Chicago Dist. Council of*

*Carpenters Welfare Fund v. Gleason & Fritzshall*, 295 Ill.App.3d 719

724-727 (1998) (joint check for $50,000); *Roderick Development*

*Investment Co. v. Community Bank*, 282 Ill.App.3d 1052, 1058-1065

(1996) (5% interest in specified payments); *see also Mid-America Fire*

*& Marine Insur. Co. v. Middleton*, 127 Ill.App.3d 887, 892-893 (1984)

(agreement to reimburse attorneys a "proportionate share of all

reasonable costs incurred" rendered the contract sufficiently

indeterminate to fall under conversion; *Sutherland v. O'Malley*, 882

F.2d 1196, 1200-1201 (7th Cir. 1989) (agreement between co-counsel to

split attorney's fees "on a fifty-fifty basis or [by some] other

equitable arrangement based on the degree of efforts" too indefinite).

Second, mistake of law or fact is not a defense to conversion.

As one court summarized conversion:

> Although conversion is considered an intentional tort
> because it requires 'an intentional exercise of dominion or
> control over a chattel' it does not require proof of
> malice, culpability, or conscious wrongdoing. It is also
> not necessary to show an intent to interfere with the
> rights of others, however, an act which is merely negligent
> is not sufficient to establish conversion.

*Martel Enterprises v. City of Chicago*, 223 Ill. App.3d 1028, 1032–33

(1991) (internal citations omitted).

The defendant's consciousness of wrongdoing is not an element of

an action for conversion.  *See Morrisette v. United States*, 342 U.S.

246, 270 (1952); *Firstar Bank, N.A. v. Faul Chevrolet, Inc.*, 2003 WL

548365 *5 (N.D. Ill. February 25, 2003), quoting W. Keeton, D. Dobbs, R. Keeton, & D. Owens, *Prosser and Keeton on Torts* § 15, pp. 92-93 (5th ed. 1984) ("The intent required is not necessarily a matter of conscious wrongdoing.  It is rather an intent to exercise dominion or control over the goods which is in fact inconsistent with plaintiff's rights...A mistake of law or fact is no defense"); *Caterpillar Financial Services Corp. v. People's Nat. Bank, N.A.*, 2012 WL 2520922 *3-5 (S.D. Ill. June 28, 2012) (conversion action for retention of 35 pieces of mining equipment against competing secured creditor who believed it held a superior security interest).

　　　Here, the second and third elements of conversion are without dispute.  The disputed monies have been sufficiently identified by source, i.e., settlement proceeds in the Niro firm's trust account. *Roderick Development*, 282 Ill.App.3d at 1058-1059 ("the money must be a specified identifiable fund"); *In re Thebus*, 108 Ill.2d 255, 260-262, (1985).  Moreover, the amounts due NewDelman, Higgins and Holze had property rights in the amounts of 5%, 3%, and 1%, respectively, of the "gross recoveries" and are also sufficiently specific.  That some calculation will be required does not defeat the conversion action. *Chicago Dist. Council of Carpenters Welfare Fund*, 295 Ill.App.3d at 726. The amounts due are absolute and unconditional and due immediately.  Each had been approved by Grail Semiconductor's Board of Directors.  Common Ex., Letter from Higgins to Hofer July 5, 2011, 688-689, ECF No. 246 (Higgins); Agreed Facts 9:22-27, ECF No. 240 (Higgins); Common Ex., Minutes of Special Board of Directors Meeting on October 4, 2011, 694-695 ECF No. 246 (NewDelman and Holze); Agreed Facts 9:14-17, ECF No. 240 (NewDelman and Holze).[10]  Common Ex.,

---

[10] Director Gilbert's declaration does not create a genuine issue of fact.  He

Priority Agreement 754-764, ECF No. 246.  The NewDelman Group demanded

payment.  Common Ex., Email from Higgins to Keller dated November 11,

2015, 1009 ECF No. 250.  Finally, if Sedgwick retained more of the

funds than due to them their retention was wrongful.  *Scheduling Corp.*

*of Am. v. Massello*, 119 Ill. App.3d 355, 359 (1983); *Hobson's Truck*

*Sales, Inc. v. Carroll Trucking, Inc.*, 2 Ill.App.3d 978, 982 (1971).

At least for the purposes of liability, it is of no significance that

Sedgwick may have believed that it was entitled to the funds received

by the Niro firm.

A genuine issue of fact exists as to the first and fourth

elements of conversion.  The Priority Agreement is key to the

conversion action, i.e., whether Sedgwick received some of the

NewDelman Group's monies.  The parties do not dispute that

GKC/Sedgwick received $12,269,881.91.  Agreed Facts 14:15-16, ECF No.

240.  If Sedgwick's construction is accurate, it would only be liable

for its aliquot share of the $3 million reduction that GKC/Sedgwick

agreed to, if it did so agree, at the mediation.  *Compare* Common Ex.,

Hofer Dep. 1616:11-1617:24, ECF No. 251 (GKC/Sedgwick agreed to $3

million discount), with Common Ex., Aff. Keller 1814:13-16, ECF No.

252 (denying disagreement absent global resolution of creditor

claims).  If the NewDelman Group's construction is accurate, Sedgwick

would be liable for amounts encompassing the in pari passu

stated, "On October 14, 2015, Grail's Board of Directors passed resolutions
approving the distribution of Mitsubishi Proceeds to certain secured
creditors and decided not to pay any other creditors at that time (including
the NewDelman Group).  This decision was made...to allow the company to
investigate and make a determination as to the validity of those creditor
claims."  Gilbert decl. 1828:25-1829:3, ECF No. 252.  That is so for two
reasons.  First, it is contrary to stipulated facts.  Agreed Facts 9:14-17,
22-27, ECF No. 240. Second, the board of directors meeting occurred on
October 14, 2015, which is after the Niro Firm disbursed funds on October 9-
13, 2015. Simply put, the conversion had already occurred.

distributions that should have been made plus the $3 million reduction, if that was agreed to at the mediation.

For these reasons, the NewDelman Group's motion will be granted as to the second and third elements of conversion and will be otherwise denied; Sedgwick's motion will be denied.

### 5.   Civil conspiracy

The NewDelman Group argues that the undisclosed side agreement, i.e., the Letter of Intent, between Niro, GKC/Sedgwick and Grail Semiconductor that authorized immediate disbursement of settlement proceeds to some, but not all signatories of the Priority Agreement, gives rise to an action for civil conspiracy and that liability extends to GKC/Sedgwick.

Civil conspiracy is a distinct cause of action.  *Dowd & Dowd, Ltd. v. Gleason*, 181 Ill.2d 460, 486 (1998); *Adcock v. Brakegate, Ltd.*, 164 Ill.2d 54 (1994).  It has the following elements: "(1) an agreement between two or more persons to participate in an unlawful act or a lawful act in an unlawful manner, (2) an injury caused by the defendant, and (3) an overt act committed in furtherance of the common scheme."  11 Russell J. Davis, *Ill. Law and Prac.*, Conspiracy § 2 (October 2021), citing *Redelmann v. Claire Sprayway, Inc.*, 375 Ill.App.3d 912, 923 (2007); *Suburban 1, Inc., v. GHS Mortgage, LLC*, 358 Ill.App.3d 769 (2005).  Proximate cause between the conspiracy and the injury is also an element.  *Reico v. GR-MHA Corp.*, 366 Ill.App.3d 48, 61 (2006); *Scott v. Aldi, Inc.*, 301 Ill.App.3d 459, 464, (1998); *Restatement (Second) of Torts* § 876, Comment d (1979).  Civil conspiracies may be oral.  *Reel v. City of Freeport*, 61 Ill.App.2d 448, 453 (1965) ("The agreement need not be written but may be an oral undertaking or a scheme evidenced by acts of the parties").

Knowing participation is required.

> While civil conspiracy is based upon intentional activity,
> *the element of intent is satisfied when the defendant*
> *knowingly and voluntarily participates in a common scheme*
> *to commit unlawful acts or a lawful act in an unlawful*
> *manner. Accidental, inadvertent, or negligent participation*
> *in a common scheme does not amount to a civil conspiracy.*
> Moreover, a mere knowledge of the fraudulent or illegal
> actions of another is not enough to show a civil
> conspiracy.

11 Russell J. Davis, *Ill. Law and Prac.*, Conspiracy § 1 (October 2021)

(emphasis added).

As the Illinois Supreme Court articulated the standard:

> *A defendant who understands the general objectives of the*
> *conspiratorial scheme, accepts them, and agrees, either*
> *explicitly or implicitly to do its part to further those*
> *objectives, however, is liable as a conspirator.* (Jones v.
> City of Chicago (7th Cir.1988), 856 F.2d 985, 992.) Once a
> defendant knowingly agrees with another to commit an
> unlawful act or a lawful act in an unlawful manner, that
> defendant may be held liable for any tortious act committed
> in furtherance of the conspiracy, whether such tortious act
> is intentional or negligent in nature.

*Adcock v. Brakegate, Ltd.*, 164 Ill.2d 54, 64 (1994) (emphasis added).

Civil conspiracy extends liability for the wrongful actions

beyond the persons directly involved to those who merely participated

in it.

> *A cause of action for civil conspiracy has the effect of*
> *extending liability for a tortious act beyond the active*
> *tortfeasor to individuals who did not act but only planned,*
> *assisted, or encouraged the act.* The determination of
> liability for a claim of civil conspiracy alleging the
> assistance or encouragement of a tortious conduct may be
> based on the same factors used to determine causation in a
> case of negligence. Moreover, the basis of the civil
> conspiracy does not rely on the particular combination of
> roles performed by the conspirators, rather, the conspiracy
> may be inferred where the parties pursue the same object by
> common means, one performing one part and another
> performing another part.

11 Russell J. Davis, *Ill. Law and Prac.*, Conspiracy § 8 (October 2021)

(emphasis added).

Conspirators are jointly and severally liable for any and all damages which flow from the conspiracy. *Hoffman-La Roche, Inc. v. Greenberg*, 447 F.2d 872 (7th Cir. 1971) (applying Illinois law); *News, Inc. v. Buescher*, 81 F.Supp. 741 (N.D. Ill. 1949) (applying Illinois law); *Selimos v. Christ*, 331 Ill. App. 412 (1947).

> Thus, once a conspiracy has been established, every act or declaration of any of the conspirators in furtherance of the common purpose is regarded as an act binding on all, and every conspirator is liable for all of the acts of each of the coconspirators done in furtherance of the objects of the conspiracy committed before or after that person's entry into the conspiracy.

11 Russell J. Davis, *Ill. Law and Prac.*, Conspiracy § 8 (October 2021).

Further, Illinois law provides that conspiratorial liability grows with the conspiracy. As the Seventh Circuit Court of Appeals explained it:

> [U]nder Illinois law one who participates actively in launching a conspiracy with limited aims, who knows that the aims have been exceeded, and who knowingly obtains direct monetary benefits from the expanded conspiracy, is a participant in that conspiracy as well as in the narrower one from which it grew. He has joined the broader conspiracy and his liability grows with it.

*Hartford Acc. & Indem. Co. v. Sullivan*, 846 F.2d 377, 385 (7th Cir. 1988).

The facts giving rise to this adversary proceeding fit neatly within the expanded conspiracy described in *Sullivan*. The co-conspirators are Grail Semiconductor, Richard Gilbert, GKC/Sedgwick, Ray Niro, and the Niro firm. At the outset, the conspiracy was limited in scope. It called for payment of GKC/Sedgwick's loan, i.e., $12,269,881.61. It was memorialized in the "Letter of Intent." Common Ex., Gilbert email dated October 12, 2015, 930, ECF No. 249; Agreed Facts 16:6-10, ECF No. 240; Common Ex., Letter of Intent 931-

1  932, ECF No. 249; Common Ex., Gruener email dated October 14, 2015,

2  937-938, ECF No. 249; Common Ex., Keller email to Gilbert dated

3  October 14, 2015, 937, ECF No. 240; Fed. R. Bankr. 801(d)(2)(E).  That

4  the Letter of Intent was never signed is of no import.  *Reel v. City*

5  *of Freeport*, 61 Ill.App.2d 448, 453 (1965) (oral agreements are

6  sufficient).  That the parties agreed to its terms and then acted on

7  it is sufficient.

8      Later, the scope expanded to include payment to some of the Third

9  Priority creditors, i.e., First Class Legal, Donald Stern and Grail

10  Semiconductor, in a manner other than that specified in the Priority

11  Agreement.  On October 7, 2015, Director Gilbert emailed Ray Niro and

12  Ashley Keller and spoke of a "meeting with the attorneys relative to

13  the 'action plan'."  Common Ex., Email from Gilbert to Keller and Niro

14  dated October 7, 2015, 916, ECF 248.  This shows an expanded scope of

15  the conspiracy.  Moreover, the Letter of Intent provides: "As further

16  consideration of this agreement, *GKC agrees that it will cooperate*

17  *with Grail Semiconductor in the negotiation and settlement of*

18  *competing claims* against the proceeds of the MEUS Litigation."  Common

19  Ex., Letter of Intent 931-932, ECF No. 249 (emphasis added); Agreed

20  Facts 16:6-10, ECF No. 240.  Within four days of transmission of the

21  Letter of Intent, the Niro firm paid $2.75 million to Donald Stern and

22  $2.25 million to Grail Semiconductor, Agreed Facts 14:17-20, ECF No.

23  240, and Grail Semiconductor authorized the employment of GKC "to

24  negotiate with the corporation's remaining creditors any claims they

25  may have."  Common Ex., Minutes of Special Board Meeting, October 14,

26  2015, 654, ECF No. 245.

27      Causation is established by the existence of an agreement to

28  distribute funds, later memorialized in the Letter of Intent, prior to

the date that the Niro firm initiated the wire transfer to Sedgwick.
The wire transfer was initiated October 9, 2015.  Agreed Facts 14:15-
16, ECF 240.  The early and full oral distribution agreement with
Sedgwick predated the wire transfer.  On October 7, 2015, two days
before the wire transfer, Director Gilbert wrote Ray Niro and Ashley
Keller an email that spoke of an "action plan" and stated "I ran out
of time today to draft the letter agreements we discussed."  Common
Ex., Email from Gilbert to Keller and Niro dated October 7, 2015, 916,
ECF No. 248.  The Letter of Intent was sent on October 12, 2015,
before the wire transfer was completed.  Agreed Facts 16:6-10, ECF No.
240; Common Ex., Gilbert email to Keller, October 12, 2015, 930, ECF
No. 249.

As a result, a civil conspiracy exists between Grail
Semiconductor, Sedgwick, and the Niro firm, save only the question of
whether the object of the conspiracy was an unlawful act.  Here, the
"unlawful act" element came in two flavors: (a) violation of the
Priority Agreement with respect to the timing and precedence payment
of creditors; and (b) the Niro firm's payment to Sedgwick without
payment or notice to the NewDelman Group.

### a.   Breach of contract

Illinois has long recognized that a party contractually bound may
be held to answer for conspiring with a third party to breach that
contract.  *Bailey v. Meister Brau, Inc.*, 535 F.2d 982, 988-989 (7th
Cir. 1976); *Blivas v. Klein*, 5 Ill.App.3d 280, 286 (1972) ("While it
is true that a party cannot be sued in tort for inducing the breach of
his own contract, he can be sued for conspiracy with a third person
who has induced him to breach his contract resulting in actual
damage."); *Regan v. Garfield Ridge Trust and Sav. Bank*, 220 Ill.App.3d

1078, 1091 (1991); 11 Russell J. Davis, *Ill. Law and Prac.*, Conspiracy § 5 (October 2021).

"A claim for a conspiracy to breach a contract depends upon one party breaching its contract and the other party inducing that party to breach." *First Fin. Bank, N.A. v. Bauknecht*, 71 F.Supp.3d 819, 855 (C.D. Ill. 2014).

The *Meister Brau* decision is instructive. Plaintiff Bailey had been the president, treasurer, a director, and chief operating officer of the James H. Black Company, which manufactured salad dressing. The company was founded by James H. Black, Sr. Black held 57,000 shares of the Black Company. Bailey and a third party, Mrs. Harre, held the balance of the shares. Black died, and Continental Illinois National Bank was his executor. Bailey's employment agreement gave him a 60-day right of first refusal to meet any purchase offer for stock held by Black or by his estate. A third party, Meister Brau, Inc., offered to purchase the shares of the estate and those of Mrs. Harre for $980,000. Bailey responded by exercising his right of first refusal. Continental refused to honor Bailey's right. Well before Bailey's 60-day right of first refusal, Continental sold the Black estate shares to Meister Brau. At the annual meeting of the Black Company shareholders, acting through an officer, Continental voted the Black estate shares. A new Board of Directors (which excluded Bailey) was elected, Bailey was removed from his positions, his salary was reduced and, shortly thereafter, he was fired "for cause." Bailey brought suit against Continental (who as executor stood in Black's shoes to the contract) and Foster, its attorney. The District Court found that Continental, Foster, and Meister Brau had interfered with the right of first refusal and entered judgment against Continental for $307,000.

Continental appealed and argued that the successor-in-interest to the
Black estate was bound by the Bailey-Black employment contract and
"that under Illinois law, a party to a contract may not be held liable
in tort to another contracting party for combining with third parties
to bring about a breach of that contract." *Id.* at 988. The Court of
Appeals affirmed that portion of the ruling, stating:

> ...It held that even if Continental were considered a party
> to the contract granting the right of first refusal, it was
> liable in tort since it had conspired with others to bring
> the breach. In our view this holding was correct.
>
> State jurisdictions are in disagreement as to whether one
> contracting party may recover against another for
> conspiring with third persons to breach the contract. Some
> jurisdictions hold that the only remedy the injured
> contracting party has under such circumstances is for
> breach of contract. In other jurisdictions a party to a
> contract who conspires with others to breach the contract
> is liable to the other contracting party in tort for so
> doing.
>
> *Illinois authority on this question takes the latter view,*
> *to the effect that a party to a contract is liable to*
> *another contracting party in damages for conspiring with*
> *others to bring about a breach of the contract.*

*Id.* at 988-989 (internal citation omitted) (emphasis added).

The *Meister Brau* court went further:

> Through its officers, Continental played an active part in
> bringing about the breach of Bailey's first refusal right
> and received inducement from Meister Brau in the form of
> indemnification against liability for its part in the
> transaction. *Having thus actively participated in bringing*
> *about a breach of a provision of a contract between Bailey,*
> *the Black Company, and the Black estate to which it was not*
> *a party[,] Continental was liable to Bailey for the tort of*
> *unlawfully interfering with his contractual rights.*

*Id.* at 989 (emphasis added).

Assuming that the Priority Agreement is construed as the
NewDelman Group suggests, the case before the court is
indistinguishable from *Meister Brau*. Director Gilbert and
GKC/Sedgwick, acting through Ashley Keller, negotiated early and full

payment of Sedgwick's debt and, in exchange, Grail Semiconductor received GKC/Sedgwick's promise to assist in the negotiation of other debts. But until such time as the proper construction of the Priority Agreement is resolved, this court cannot determine whether the conspiracy involved an "unlawful act."

### b.    Fraud

Illinois recognizes conspiracy to commit fraud. *Seefeldt v. Millikin Nat. Bank of Decatur*, 154 Ill.App.3d 715, 719 (1987); *Zokoych v. Spalding*, 36 Ill.App.3d 654, 667 (1976). Proof of conspiracy requires the aggrieved party to prove "a conspiracy" and the elements of fraud. *Seelfeldt*, 154 Ill.App.3d at 719.

As a rule, silence is not a sufficient basis for fraud. *Hirsch v. Feuer*, 299 Ill.App.3d 1076, 1086 (1998). But concealment of a material fact may form the basis of an action for fraud:

> (1) the defendant concealed a material fact under circumstances that created a duty to speak; (2) the defendant intended to induce a false belief; (3) the plaintiff could not have discovered the truth through reasonable inquiry or inspection, or was prevented from making a reasonable  inquiry or inspection, and justifiably relied upon the defendant's silence as a representation that the fact did not exist; (4) the concealed information was such that the plaintiff would have acted differently had he or she been aware of it; and (5) the plaintiff's reliance resulted in damages.

*Bauer v. Giannis*, 359 Ill.App.3d 897, 902-903 (2005) (internal citation omitted).

A duty to speak arises from a fiduciary or a confidential relationship. *Connick v. Suzuki Motor Co.*, 174 Ill.2d 482, 500 (1996); *Bremer v. Bremer*, 411 Ill. 454, 465 (1952); *D'Attomo v. Baumbeck*, 394 Ill.Dec. 601, 622 (2015). In some cases, a fiduciary relationship exits as a matter of law. *Van Dyke v. White*, 2019 IL 121454, 433 Ill.Dec. 153 (2019); *Khoury v. Niew*, 2021 IL App (2d)

74

200388 *8 (2021). Examples of fiduciary relationships that exist as a matter of law are attorneys and clients, principals and agents, guardians and wards, and members of a partnership or joint venture. *Bremer v. Bremer*, 411 Ill. 454, 465 (1952); *Khoury v. Niew*, 2021 IL App (2d) 200388 *8 (2021). In other cases, fiduciary relationships arise "as a matter of fact when one party places trust and confidence in another and the entrusted party thereby gains influence and superiority over the other party." *Khoury v. Niew*, 2021 IL App (2d) 200388 *8 (2021); *Van Dyke*, 2019 IL 121452, 433 Ill.Dec. 153, 131 N.E.3d 511 (2019).

Absent some other source of duty, an attorney's obligation is to the client, and only to the client, *DeLuna v. Burciaga*, 223 Ill.2d 49 (2006), or, in very limited circumstances, third party beneficiaries of the attorney-client relationship. *Oakland Police & Fire Ret. Sys. v. Mayer Brown, LLP*, 861 F.3d 644, 653 (7th Cir. 2017) (describing the limited group of persons who are not clients that are deemed "primary beneficiaries of the attorney's relationship with another client and that are owed a duty of care"). Ordinarily, that limitation of the attorney's duty also applies to the distribution of funds held by the attorney. *People ex rel. Illinois State Bar Ass'n v. Tracey*, 314 Ill. 434, 437, 145 N.E. 665, 666 (1924) ("[f]unds collected or received by an attorney for his client are trust funds, and it is the duty of such attorney to immediately pay them over to his client, *unless there is some legal reason for not doing so, as in cases where the title or possession of the client is questioned by another*") (emphasis added); *Dowling v. Chicago Options Associates, Inc.*, 226 Ill.2d 277 (2007) (judgment debtor's law firm owed no duty to judgment creditor).

But the law of agency provides one such additional source of duty

for attorneys that expands the pool of persons to whom a fiduciary

duty is owed.  Attorneys act as agents, even for non-clients.  *Kouba*

*v. E. Joliet Bank*, 135 Ill. App.3d 264, 267, 481 N.E.2d 325, 328

(1985) ("[a]n attorney, broker, auctioneer and similar persons

employed for a single transaction or for a series of transactions are

agents, although as to their physical activities they are independent

contractors. *Hoffman v. Morton Co.*, 35 Ill.App.2d 97, 181 N.E.2d 821

(1962); *Restatement (Second) of Agency*, explanatory notes § 1 comment

e; at 11 (1957); *People ex rel. Illinois State Bar Ass'n v. Tracey*,

314 Ill. 434, 437, 145 N.E. 665, 666 (1924) (recognizing a title

dispute as creating duties to others).

The principal is always "the source of power in an agency; it

cannot be created by the declarations of the agent."  1 Karl Oakes,

*Ill. Law and Prac.*, Agency § 3 (October 2021).  No particular words

are required to create a principal-agent relationship.  *Purgett v.*

*Weinrank*, 219 Ill.App. 28 (1920).  Moreover, the creation of such a

principal-agent relationship does not depend on the existence of a

contract, enforceable or otherwise.

> While agency is most often thought of as being contractual,
> it is not necessary that the relationship arise out of
> contract. Since the relationship is not necessarily
> contractual, consideration is not required for the creation
> of an agency and the capacity to contract on the part of
> both parties is not necessary.

1 Karl Oakes, *Ill. Law and Prac.,* Agency § 3 (October 2021).

Illinois courts have long understood that a principal-agent

relationship exists where one party put money or property into the

other party's hands to hold or to manage.  1 Karl Oakes, *Ill. Law and*

*Prac.*, Agency § 3 (October 2021); *Andrews v. Votaw*, 240 Ill.App.3d

311, 320 (1926) ("[a]n agent is one who undertakes to manage some

affairs to be transacted for another by his authority on account of the latter, who is called the principal, and to render an account"); *Dean v. Ketter*, 328 Ill.App. 206, 210 (1946). As one court explained it:

> A person who undertakes to manage some affair for another, on the authority and for the account of the latter, who is called the principal, is an agent. *Thus, when a person puts his property in the hands of another to keep or manage, he creates, as between him and that other, the relation known as principal and agent.* Therefore, when Bernice Dopak accepted Catherine Morys' keys, agreed to collect rents for her and take care of her building, she became Mrs. Morys' agent.

*In re Morys' Est.*, 17 Ill.App.3d 6, 9, 307 N.E.2d 669, 671 (1973) (internal citations omitted) (emphasis added).

Here, the NewDelman Group appointed the Niro firm to receive and distribute the Mitsubishi Electric litigation proceeds under the terms of the Priority Agreement and the Niro firm agreed to do so. As a result, a principal-agent relationship existed between the Niro firm and the NewDelman Group; as a result, the Niro firm owed those creditors a duty to speak. *Morys*, 17 Ill.App.3d at 9.

Material facts are those that would have caused the other party to "act differently knowing the information" or of the "type of information" that the opposing party "would be expected to rely" upon in making a decision. *Connick v. Suzuki Motor Co.*, 174 Ill. 2d 482, 505, 675 N.E.2d 584, 595 (1996); *Mackinac v. Arcadia Nat. Life Ins. Co.*, 271 Ill.App.3d 138, 141 (1995); 1 Karl Oakes, *Ill. Law and Prac.*, Agency § 15 (October 2021) ("[T]he agent must disclose to the principal all material facts relating to the agency and keep him or her informed on all matters which may come to the agent's knowledge which would in any way affect a transaction and the subject matter of the agency..."), citing *Moehling v. W. E. O'Neil Const. Co.*, 20 Ill.

2d 255, 170 N.E.2d 100 (1960); *Lerk v. McCabe*, 349 Ill. 348, 182 N.E. 388 (1932).

The Niro firm's payment to one group of creditors without notice to other groups was material.  That firm was faced with facially ambiguous instructions for the distribution of Mitsubishi Electric litigation proceeds and with insufficient funds to pay all signatories to the Priority Agreement.  The NewDelman Group expected full payment or, in the alternative, notice that the firm intended not to pay them.  This information is of the type that a signatory to an intercreditor agreement would expect in deciding whether to exercise its rights to preclude the firm from proceeding with distribution.  The NewDelman Group might have informed the Niro firm that it objected to payment of Sedgwick or might have sought intervention by a court of proper jurisdiction to preclude the firm from doing so.  Because the Niro firm concealed the plan to distribute funds pursuant to the side deal, the NewDelman Group was deprived of the opportunity to protect its rights.

Unlike conspiracy for breach of contract, construction of the contract is not necessary.  Faced with facially ambiguous instructions for distribution and insufficient funds to also pay the NewDelman Group, the Niro firm's failure to speak prior to paying GKC/Sedgwick satisfies the first element of fraud by concealment.  The second and fourth elements of concealment fraud are also satisfied, and the Niro firm's actions are in furtherance of the conspiracy such that Sedgwick is liable for those acts.  There is insufficient evidence with respect to the third and fifth elements of concealment fraud.

For these reasons, the NewDelman Group's motion will be granted as to all elements of a civil conspiracy and as to the first, second

and fourth elements of concealment fraud, and will be otherwise denied; Sedgwick's motion will be denied.

**VI.    CONCLUSION**

For the reasons stated herein, Sedgwick FundingCo, LLC's motion will be granted in part and denied in part; the NewDelman Group's motion will be granted in part and denied in part.  The court will issue an order from chambers.

**Dated:** January 20, 2022

**Fredrick E. Clement**
**United States Bankruptcy Judge**

# Instructions to Clerk of Court

### Service List - Not Part of Order/Judgment

**The Clerk of Court is instructed to** send the Order/Judgment or other court generated document transmitted herewith *to the parties below*. The Clerk of Court will send the document via the BNC or, if checked ____, via the U.S. mail.

| Attorneys for the Plaintiff(s) | Attorney for the Defendant(s) |
|---|---|
| **Bankruptcy Trustee** (if appointed in the case) | **Office of the U.S. Trustee**<br>Robert T. Matsui United States Courthouse<br>501 I Street, Room 7-500<br>Sacramento, CA  95814 |